**HUCK MANUFACTURING COMPANY, Petitioner Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.**

**Nos. 81–4075, 81–4125.**

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1982.

Rehearing Denied April 8, 1983.

*See Monroe, supra; Marshall, supra; Adams, supra; Allis, supra.*

8. Each party shall bear his own costs on appeal.

A.J. Harper, II, L.G. Clinton, Jr., Carolyn Barefield Luedke, Houston, Tex., for petitioner cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, NLRB, Lee W. Jackson, Washington, D.C., for respondent cross-petitioner.

Bruce Fickman, Chris Dixie, Houston, Tex., for intervenor United Steelworkers of America, AFL–CIO.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

We consider here a petition for review and cross application for enforcement of an order of the National Labor Relations Board (the "Board" or "NLRB") entered after a hearing before an Administrative Law Judge (the "ALJ").[1] After oral argument and careful consideration of the record and briefs, we enforce in part, vacate in part, and remand for restructuring of the remedy in accordance with this opinion.

## I. FACTS

The dispute in this case grew out of bargaining sessions that occurred after the NLRB certified the United Steelworkers of America (the "Union") on December 26, 1978, as the representative of production and maintenance workers at the Huck Manufacturing Company (the "Company") facility in Waco, Texas. The Board found that the Company had violated the National Labor Relations Act (the "Act") through various acts of omission and commission. The Company was found to have violated Sections 8(a)(5)[2] and 8(a)(1)[3] of the Act by refusing to bargain in good faith with the Union. Among the bases for this finding was a Board determination that, in the absence of an impasse in negotiations, the Company unilaterally implemented a shift differential, wage increase, and dental plan. The Board also held that the Company refused to negotiate in good faith on the subjects of arbitration, union dues checkoff, and duration of the contract terms. In addition, a speech by a Company representative was deemed to be coercive action violating Section 8(a)(1) of the Act, and certain

---

1. The Board's original order applied to two related cases that were consolidated and heard before the ALJ. This order and the ALJ's decision are reported at 254 NLRB 739 (1981). A subsequent case, resolved by a stipulation that was contingent on the outcome of the original cases, is reported at 255 NLRB 170 (1981). These decisions were consolidated for appeal.

2. Section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976), provides in part: "It shall be an unfair labor practice for an employer—(5) to refuse to bargain collectively with the representatives of his employees . . ."

3. Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976), provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title. . . ." Section 157 provides in relevant part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities. . . ."

payments to nonstriking workers were held to violate Sections 8(a)(1), (3),[4] and (5) of the Act. Because the contract negotiations, strike and subsequent events are crucial in our review of these findings, we discuss them at some length.

*The Pre-Strike Negotiations.* At the first negotiating session, on February 9, 1979, the Union presented its contract proposal. The meeting was limited to an article by article discussion of it. At the second session, on March 8, the parties agreed to defer discussion of economic matters until they resolved disputes about other contract provisions. The Union insisted that no part of the contract be implemented until the parties had reached total agreement. The Company presented its contract proposal and the parties discussed it, article by article. They reached tentative agreement on some provisions, but the Company refused to agree to arbitration, to dues check-off, or to a contract term exceeding one year. Because it wished to negotiate wages annually, it likewise refused to agree to a cost of living adjustment clause. This discussion continued at a meeting held the next day, March 9.

On March 26, the parties met again and reviewed the Company's second proposal,[5] which included those items on which the parties previously had agreed. While the Company's negotiator, Clinton, stated that he was willing to discuss Union proposals, he maintained that the Company would not agree to certain items, including arbitration and dues check-off. The Company also refused the Union's request for a wage increase since it claimed it had granted a 7% raise in December 1978, and the President's wage guidelines allowed no more. The Union disputed the Company's calculations.

At the next two sessions, held on April 10 and 11, a federal mediator was present. The parties continued to bargain and reached agreement on some items, but remained apart on those mentioned above. During a break in the second meeting, the mediator told the Union negotiator, Brantley, that the Company would agree to dues check-off if the Union would drop its demand for an arbitration provision. When the parties discussed this possibility, the Company presented the Union a check-off proposal allowing employees to revoke their authorizations by submitting seven days written notice and providing that authorizations expired after one year, or at the end of the contract term, whichever came first. The Union refused this proposal. Near the end of the meeting, Brantley requested that the Company state its final offer so that he could present it to a membership meeting on April 22. The final offer reiterated the Company's prior position; the Union rejected it, and—following a brief meeting on May 14—a strike began on May 15.

*The Strike.* The strike broke up on May 18 because of dissension in the Union ranks rather than anything to do with contract terms. The Company had continued operations during the strike. The strikers returned to work on May 21. A number of events that occurred in this time span were the subject of a hearing before the ALJ. Three concern us today.[6] First, the Company paid all nonstriking workers double time for the entire week of the strike, including May 14, the day before the strike. Strikers who worked on the 14th received straight time. Second, Company Vice President and General Manager Mervin Mull delivered a

---

**4.** Section 8(a)(3), 29 U.S.C. § 158(a)(3) (1976), provides in part: "It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ..."

**5.** Throughout the negotiations the Company took responsibility for the drafting of proposals incorporating provisions on which the parties had tentatively agreed.

**6.** The ALJ found that the Company had properly discharged a worker for allegedly sabotaging his machine immediately before the strike began. The ALJ also found for the Company on a number of other issues, including alleged threats by supervisory personnel against workers for engaging in protected concerted acts. These issues are not before us.

prepared speech to the returning strikers in each shift on May 21. And third, the Company decided during the strike to implement unilaterally a policy whereby higher wages would be paid during less desirable shifts to attract employees to work during those shifts. The policy was known as a shift differential. The Company implemented the shift differential on May 21.

*Post-Strike Occurrences.* The parties returned to the bargaining table on May 22. The Company withdrew its check-off proposal and refused to modify the remainder of its "final offer." Likewise, no progress was made at the next meeting, on June 5, although the Union offered to modify its check-off clause demands.

The parties met again on July 19. Although no significant agreements were reached, Clinton stated that the Company was studying both a wage increase and a dental plan. The parties agreed that they would consider the wage proposal at the next session, and that if the Company completed its wage study before that meeting, it would inform the Union of its proposal. On July 23, Mull wrote Brantley that the Company had decided to grant a $.35 per hour across the board increase, effective July 30, and that Brantley should notify Mull if he wished to discuss the matter. On the next day, the Company posted notice of the proposed wage increase on its bulletin board. On July 25, Brantley received Mull's letter and responded that the Union did not want "piecemeal" implementation of the contract and that the wage increase was a subject of negotiation. The Company did not implement the wage increase as planned.

Before the next meeting, the Union filed unfair labor practice charges with the NLRB. On August 2, the parties met once more. The Union agreed to portions of the Company's proposals, but several issues remained undecided. On August 31, the General Counsel issued the complaint in this case. On November 2, the Company presented the Union another proposed contract, which included a dental plan and a contract expiration date two months later, on December 26, 1979. No final agreement was reached and the Company later unilaterally instituted a wage increase and the dental plan.

## II. DISCUSSION

For purpose of analysis, we examine the Board's findings under the following headings: (a) Posting of Wage Proposal; (b) The Speech; (c) Payments to Nonstrikers; (d) Impasse and Unilateral Acts; and (e) Overall Bargaining. Our consideration of the Board's findings is narrowly channeled. We must defer to the Board's expertise in "applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). Regarding factual findings, we are required to uphold the Board's decision "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1976); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our review is slightly broader in instances requiring an examination of the legal effect of a given set of facts. "The NLRB's resolution of such questions is to be upheld if reasonable, consistent with the Act, and based on findings supported by substantial evidence." *NLRB v. L.B. Priester & Son, Inc.,* 669 F.2d 355, 359 (5th Cir.1982). Bearing in mind our function as something more than a rubber stamp, but something less than a *de novo* factfinder, we turn to the case in hand.

*Posting of Wage Proposal.* The Board found that posting of the following notice constituted direct bargaining with employees and therefore violated Sections 8(a)(5) and (1) of the Act:

"NOTICE

July 24, 1979

"Recognizing that inflation is running at or near double digits, the Company proposes to grant a 35 cent per hour across the board increase for all Hourly Rated employees effective Monday, July 30, 1979.

"This proposal has been forwarded in a letter dated July 23, 1979 to Mr. L.H. Brantley, Sub-Director for the United Steelworkers of America at their Dallas headquarters.

HUCK MANUFACTURING COMPANY
Waco Division
/s/ MF Mull .
MF Mull
Vice President & General Manager"

We disagree. The notice stated only that the Company had proposed a wage increase and that the Union's negotiator, Brantley, had been notified of this. The notice was entirely factual in nature and contained no threats or promises. It was therefore a privileged communication of the Company's proposals under Section 8(c) of the Act,[7] *NLRB v. Tex-Tan, Inc.*, 318 F.2d 472, 475 (5th Cir.1963), and did not constitute direct bargaining. Further, we do not consider the notice evidence of bad faith negotiation. It did not subvert or disparage the Union or its negotiator. Our finding below that the Company bargained in bad faith on other issues does not affect this decision. Although a Company's overall bargaining may indicate bad faith, this does not transform each individual action into a violation of the Act. Those portions of the order based on the notice are vacated.

*The Speech.* On the day the strikers returned to work, Mull delivered an angry speech to the returnees. Reading from a prepared text, Mull accused the strikers of acting like a "mob" by engaging in vandalism, threats, and intimidation, stating that if another strike occurred, "replacement job awards will be made immediately." He also informed the strikers that nonstrikers had been paid doubletime for the previous week, and that the Company would not grant the dues check-off clause requested by the Union. The Board found that the speech violated Section 8(a)(1) because it disparaged, reprimanded, harassed, and threatened employees for engaging in a lawful strike. To the extent that these findings, or any others, were based *solely* on Mull's speech, we vacate those parts of the Board's order based on the findings.

▮ The General Counsel specifically stated at the hearing that he did not advance the speech itself as a violation of the Act. We believe the complaint could be read to allege such a violation but that, in fairness, the General Counsel's disavowal should be treated as a gloss on the complaint. The General Counsel's contention at the hearing was that Mull deviated from his text and that these deviations, in combination with the prepared text, violated Section 8(a)(1). The hearing was conducted on this theory. The ALJ held, however, that the evidence did not support a finding that Mull deviated from his text. Under these circumstances, it was improper for the Board to find a violation of the Act based upon the speech alone. Enforcement of a Board finding of a violation "neither charged in the complaint nor litigated at the hearing" violates basic concepts of due process. *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1074 (1st Cir.1981) (quoting *NLRB v. H.E. Fletcher Co.*, 298 F.2d 594, 600 (1st Cir.1962)); *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1161 (5th Cir.1977). That part of the Board's order based on the speech is vacated. We express no opinion on whether the speech alone in fact violated the Act. However, the Board was not precluded from examining those acts mentioned in the speech and charged in the complaint, such as the payments discussed below.

*Payments to Nonstrikers.* The Board found that the Company paid nonstriking workers double-time wages for the entire week of the strike, including May 14, the

---

**7.** Section 8(c), 29 U.S.C. § 158(c) (1976), provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, should not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

day before the strike began.[8] On May 14, both strikers and nonstrikers worked, but only nonstrikers received the extra wages. The decision to make these payments was made on May 18, the day the strike ended. According to the testimony of Company officials, upon learning that the strikers were returning to work, the nonstrikers shut down their machines and demanded a meeting with management. The nonstriking workers were very angry that the strikers were to be reinstated. The nonstriking employees, who had apparently set production records during the week, asserted that they were harassed, threatened, and intimidated by the strikers. At the meeting, officials of the Company explained that it was required by law to rehire the strikers. One of the nonstriking workers then suggested that although "money does not solve everything," the payment of double time for the week would help compensate them for what they had achieved and endured. In what the Company characterizes as a "spontaneous gesture of gratuity (sic)," Mr. Mull replied, "Done."

■ The Board found that making these payments constituted an unfair labor practice. For reasons stated below, we agree that the extra wages for May 14 were paid in violation of the Act but conclude that the Company has adequately justified the May 15–18 payments. The Board's order is accordingly enforced in part and vacated in part.

■ *The May 14 Payments.* The Board adopted the ALJ's conclusion that the Company's May 14 payments violated Sections 8(a)(1), (3) and (5) of the Act. The Board

need not show actual coercion to establish an 8(a)(1) violation; it need only draw a reasonable conclusion from the evidence that the Company's conduct would tend to coerce employees from engaging in protected activity. *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 414 (5th Cir.1981). In finding an 8(a)(1) violation, the ALJ did not find that the payments *themselves* tended to be coercive, but that Mull's reference to the payments in his speech was coercive. We have already held that the speech will not support a violation of the Act in this case. However because, as we discuss below, the payments were properly held to discriminate against strikers in violation of Section 8(a)(3), the Board reasonably could have found a tendency to coerce workers not to strike and could have concluded that Section 8(a)(1) was violated derivatively. R. Gorman, Labor Law 132 (1976).

■ Section 8(a)(3) proscribes discrimination in regard to a term of employment such as wages engaged in with the purpose of discouraging union membership. The May 14 payment obviously discriminated among workers based solely on union activity. "[O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." *NLRB v. Haberman Const. Co.,* 641 F.2d 351, 359 (5th Cir.1981) (en banc) (quoting *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967))[9]. We agree with the

---

**8.** The Company argues that nonstriking employees were paid double time for straight time hours on May 14, and double their overtime pay only on May 15–18. The Union urges that the Board was correct in finding double time had been paid for all hours worked during the week. The record on this issue is confusing; however, there is evidence to support the Board's finding. We need not ultimately resolve this issue now, because the Board's order requires that the Company submit time and payroll records to the Board sufficient to compute back pay. As discussed, *infra,* this opinion authorizes back pay for May 14 only. On

remand, the Board should confirm its determination of the proper rate by reference to the Company's records.

**9.** Under *NLRB v. Great Dane Trailers, Inc., supra,* if the employer's conduct is "inherently destructive" of important employee rights, the Board may find an 8(a)(3) violation notwithstanding an employer's showing of business justification, and no anti-union animus need be proved. If, however, the conduct's effect on employee rights is "comparatively slight", and the employer shows a legitimate business justification for the conduct, the General Counsel must prove anti-union motivation to establish a

ALJ and the Board that the Company has not met this burden. The Company's proffered justification is simply not applicable to the May 14 payments. It is undisputed that on that day both striking and nonstriking employees worked under normal conditions. No threats or harassment are alleged to have taken place and the workers who subsequently refused to strike did not set any production records working independently from striking workers on that day. Even assuming that subsequent events gave rise to a legitimate business need to placate the nonstrikers, that justification is unrelated to the events of May 14 and does not legitimize discriminatory compensation of workers on that day. The portions of the order relating to the May 14 payments are enforced.[10]

*The May 15–18 Payments.* The ALJ's decision was silent regarding the May 15–18 payments. The Board adopted the ALJ's conclusions of law and order and amended them to include violations of Sections 8(a)(1) and (5) based on these payments. The complaint did not allege that these payments also violated Section 8(a)(3), and no such finding was made by the Board.

■ A threshold issue is whether the May 15–18 payments tended to coerce the strikers to forego protected activity. *Pioneer Natural Gas Co. v. NLRB, supra.* Although the Board did not set out the facts upon which it based the 8(a)(1) violation, we think it reasonably could have concluded that higher than normal wage payments to non-strikers would have this tendency. Actions which may have an impact on future

exercise of the right to strike are coercive under Section 8(a)(1). *See e.g. NLRB v. Rubatex Corp.,* 601 F.2d 147, 150 (4th Cir.), *cert. denied* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979). Conferring such a benefit on nonstrikers during this strike could have had that tendency.

■ The tendency of the May 15–18 payments to have a coercive effect on strikers is, however, not enough to establish a Section 8(a)(1) violation. The statute has been held to require a weighing of employer and employee interests. The employees' right to engage in activity protected by the Act "must be balanced against the employer's right to maintain order in his business." *Crown Central Petroleum Corp. v. NLRB,* 430 F.2d 724, 729 (5th Cir.1970). "Employer conduct that otherwise tends to interfere, restrain or coerce employees 'may be held lawful if it advances a substantial and legitimate company interest in plant safety, efficiency or discipline,' or is 'in accordance with plant custom or business necessity'." *Soule Glass & Glazing Co. v. NLRB, supra,* 652 F.2d at 1077 (quoting R. Gorman, Labor Law, *supra,* at 133).[11]

Although we recognize that initially the responsibility to balance these conflicting rights rests with the Board, *Crown Central Petroleum Corp. v. NLRB, supra,* 430 F.2d at 730, we believe the balance was improperly struck in this case. The Company's legitimate business necessity asserted for the May 15–18 payments outweighs their coercive effect on the strikers. In the first place, we are not convinced that the Board balanced the parties' interests at all. The

violation. 388 U.S. at 34, 87 S.Ct. at 1797; *NLRB v. Haberman Const. Co., supra,* 641 F.2d at 359. Because we find no substantial business justification has been shown, we need not decide whether the effect of the May 14 payments on employee rights is "inherently destructive" or "comparatively slight."

**10.** The unilateral adoption of a change in wages affecting all the Company's workers on May 14 also constitutes a failure to bargain in violation of Section 8(a)(5) as the Board found.

**11.** The employer's business justification is treated differently under Sections 8(a)(1) and 8(a)(3). *Crown Central Petroleum Corp. v.*

NLRB, *supra,* 430 F.2d at 727–28 and nn. 11, 15. Under Section 8(a)(3), the government must rebut the employer's justification by showing actual anti-union motivation, or that the conduct was "inherently destructive" of employee rights. *See note 9, supra.* Since the May 15–18 payments were not alleged to violate § 8(a)(3), this analysis is not appropriate. Under Section 8(a)(1), neither showing is required, *Crown Central Petroleum Corp. v. NLRB, supra; NLRB v. Florida Medical Ctr., Inc.,* 576 F.2d 666, 672 (5th Cir.1978), rather, the business necessity for the employer's action is simply balanced against its coercive effect.

ALJ's finding that the Company failed to prove a business justification was clearly confined to the issue of the May 14 payments. The ALJ did not consider the company's justification for the May 15–18 payments and, therefore, did not balance the parties' interests. The Board simply modified the ALJ's conclusions and order to include violations of Section 8(a)(1) based upon these payments. Yet, the Board provided no indication that it conducted the required analysis and found the Company's justification outweighed by the coercive effect on the strikers. We think the record precludes such a finding.

The uncontradicted testimony of Company officers established that, after the strike was over, nonstriking employees had shut down their machines in protest of the strikers' reinstatement. Thus, the payments cannot be construed as an attempt to restrain them from joining the strike. Preventing further interruption of production in such circumstances is a substantial business motivation. This is not a case in which nonstrikers are merely rewarded for refusing to strike. *See e.g. NLRB v. Rubatex Corp., supra.* The payments were made as an inducement to continue production. The payments also served to soothe angry nonstriking workers by compensating them for harassment suffered and production records set,[12] thereby helping to ensure a smooth return of the strikers. This, too, is a legitimate and substantial business reason for the payments. Finally, it is significant that the payments were proposed by an employee·rather than by management. This fact reinforces and confirms our conclusion that the payments were a legitimate response to a real business necessity and were not mere bribes cloaked in a justification confected after the fact.

The distinction between the May 15–18 payments and the May 14 payments is apparent. The May 15–18 payments applied to a period during which the nonstrikers' complaints arose and during which production records were set. These payments did not involve unequal pay for equal work based solely on the employees' decision to strike. The May 14 payments did.

Balanced against the Company's substantial business reasons for the May 15–18 payments is a relatively slight tendency of the payments to deter protected conduct. Instituted after the strike was over, the payments had no tendency to deter participation in the by-gone strike. Any tendency to deter participation in future strikes is minor. A worker considering not striking in the future because of potential monetary awards would have to rely on reoccurrence of the unusual facts of this case. We decline to enforce the portion of the Board's order concerning the May 15–18 payments.[13]

---

12. *Cf. Omaha Typographical Union, No. 190 v. NLRB,* 545 F.2d 1138, 1143–44 (8th Cir.1976) (selective bonuses rewarding nonstrikers from another bargaining unit for extraordinary effort in continuing production is legitimate business purpose). It makes no difference that, as the Board correctly observes, there is no direct evidence of specific examples of harassment or of production records other than the Company officers' testimony. What is relevant is the nonstriking employees' *perception* that these factors warranted interruption of production and a demand for remedial action by the Company. This is uncontroverted in the record.

13. Having determined that the May 15–18 payments do not violate Section 8(a)(1), we also conclude that the unilateral implementation of those payments without Union consultation in these circumstances is not an impermissible failure to bargain under Section 8(a)(5). This court has recognized that in certain limited circumstances, *de minimis* unilateral wage increases do not violate Section 8(a)(5). *NLRB v. Southern Coach & Body Co.,* 336 F.2d 214, 217–18 (5th Cir.1964) (necessitated by economic necessity to maintain production during strike); *White v. NLRB,* 255 F.2d 564, 565 (5th Cir.1958), *cited with approval in NLRB v. Katz,* 369 U.S. 736, 747 n. 14, 82 S.Ct. 1107, 1113 n. 14, 8 L.Ed.2d 230 (1962). *See also NLRB v. Fitzgerald Mills Corp.,* 313 F.2d 260, 267–68 (2d Cir.1963). Although these cases involved increases established by past company policy, we think the facts of this case bring it within the principle that certain minor unilateral wage increases should not be treated as refusal to bargain in good faith. The May 15–18 payments were not initially conceived by the Company, were motivated by business necessity, and were of very limited duration. They did not violate Section 8(a)(5).

*Impasse and Unilateral Acts.* The Company decided during the strike to implement a shift differential, and did so on May 21.[14] This action was taken without prior notice to or consultation with the Union. As a general rule, unilateral changes in the terms and conditions of employment instituted by an employer during contract negotiations without consultation with the Union constitute failure to bargain collectively in violation of Section 8(a)(5). *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. J.P. Stevens & Co., Inc., Gulistan Div.,* 538 F.2d 1152, 1162 (5th Cir.1976); *NLRB v. Tex-Tan, Inc., supra,* 318 F.2d at 482. The principal exception to this rule occurs when the negotiations reach an impasse: when impasse occurs, the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the Union during bargaining. *NLRB v. Katz, supra; NLRB v. Crompton-Highland Mills,* 337 U.S. 217, 224–25, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949); *NLRB v. Tex-Tan, Inc., supra.*[15] Although the Company had proposed a shift differential during negotiations, the ALJ found that no impasse had existed on May 21 and that the Company's unilateral action therefore violated Section 8(a)(5). We think substantial evidence supports this finding.

Impasse has been defined as "a state of facts in which the parties, despite the best of faith, are simply deadlocked." *NLRB v. Tex-Tan, Inc., supra,* 318 F.2d at 482; *Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656, 664 (1982) ("temporary deadlock or hiatus in negotiations"). Determination of impasse, which depends on the mental state of the parties,

is a highly subjective inquiry. As such, the issue is particularly amenable to the expertise of the Board as fact finder. *NLRB v. J.H. Bonck Co.,* 424 F.2d 634, 638 (5th Cir. 1970); *Dallas Gen. Drivers, Warehousemen & Helpers, Local No. 745 v. NLRB,* 355 F.2d 842, 844–45 (D.C.Cir.1966) (Burger, J.).

In finding that no impasse existed on May 21, the ALJ emphasized that at no time either before or after that date did either party indicate that further negotiations would be fruitless. Indeed, a negotiating session was held on May 22, the day following the Company's unilateral action. Although the Company rigidly adhered to many of its positions, it repeatedly asserted that it was willing to discuss them. The Union's chief negotiator testified that he never felt the parties were at an impasse, and the ALJ expressly relied on the credibility of that testimony. This is especially significant since for a deadlock to occur, *neither party* must be willing to compromise. We also think it significant that a federal mediator was present at negotiating sessions on May 14 and May 22, immediately before and after the alleged impasse date. His presence reinforces the inference that the negotiations were continuing at that time. *Cf. NLRB v. Cambria Clay Prods. Co.,* 215 F.2d 48, 55 (6th Cir.1954) (failure of mediator to schedule further meetings creates inference of impasse). Finally, the ALJ noted that the parties had met six times since the initial meeting at which a contract was proposed, that bargaining had occurred at only four of these meetings, and that the limited number of meetings was a circumstance entitled to some weight. The Company argues that all seven meetings involved bargaining. However, the evidence indicates that the disre-

---

**14.** The parties have stipulated that if unilateral implementation of the shift differential was improper, so was the later unilateral implementation of a wage increase and dental plan. Therefore, we confine our discussion to the conditions present when the Company implemented the shift differential.

**15.** In this circuit, we have held that an employer need not bargain to impasse before changing terms of employment if the union has been informed of the proposed changes "under circumstances which afford a reasonable opportunity for counter arguments or proposals." *NLRB v. Citizens Hotel Co.,* 326 F.2d 501, 505 (5th Cir.1964), *quoted in A.H. Belo Corp. (WFAA–TV) v. NLRB,* 411 F.2d 959, 970 (5th Cir.1969) *cert. denied,* 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). No such consultation was undertaken by the Company in this case.

garded sessions consisted primarily of recitations of contract terms, and the record of the bargaining history supports the ALJ's findings.

■ The Company's most vehemently-pressed argument is that the Union's request for a "final offer," the Company's submission thereof, and the subsequent strike are definitive evidence of an impasse. However, the ALJ found that the "final offer" was simply a consolidation of previous bargaining positions and that the strike was called to "put the heat on" the Company, rather than to break an impasse. The ALJ reasonably could have found, in the light of facts already discussed, that the strike was designed to soften the Company's rigid position in ongoing negotiations and was not an indication of deadlock. The Supreme Court recently approved the Board's finding that strikes often occur during the course of negotiations and are not necessarily associated with impasse. *Charles D. Bonanno Linen Service, Inc. v. NLRB, supra,* 102 S.Ct. at 726, 70 L.Ed.2d at 665. In light of this, the strike is not overwhelming evidence of an impasse in this case. *NLRB v. J.R. Bonck Co., supra,* 424 F.2d at 638. Therefore, we enforce that part of the Board's order finding the Company's unilateral acts to be violations of the Act.[16]

■ *Overall Bargaining.* Section 8(d) of the Act imposes a duty on employers to bargain collectively in good faith; refusal to do so is a violation of Section 8(a)(5). At the same time, the Act expressly provides that the duty does not compel either party to agree to a proposal or make a concession. 29 U.S.C. § 158(d) (1976); *NLRB v. American Nat'l. Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952). There is obviously significant tension between these provisions. The line between protected and proscribed conduct is a faint one that shifts with the circumstances of negotiation. To draw it, the Board must make reasoned inferences about the parties' subjective mental states. Accordingly, the views of the Board are entitled to great weight. *NLRB v. Big Three Industries, Inc.,* 497 F.2d 43, 46–47 (5th Cir.1974). Indeed, this court will enforce a Board determination of bad faith if it "finds support in the record as a whole ... 'even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *NLRB v. Herman Sausage Co.,* 275 F.2d 229, 231 (5th Cir.1960) (quoting *NLRB v. Fant Milling Co.,* 360 U.S. 301, 309 n. 10, 79 S.Ct. 1179, 1184 n. 10, 3 L.Ed.2d 1243 (1959)). The ALJ found that the Company had engaged in bad faith bargaining based upon his consideration of the entire course of negotiations.[17] Substantial evidence gleaned from the whole record supports his determination.

■ The Company's position regarding the duration of the proposed contract is substantial evidence of bad faith. The Company argues that this issue was not raised in the Complaint and that the ALJ "gratuitously" considered it. However, in this circuit, a complaint before the Board is not judged by rigid pleading rules. A finding not based on a charge in the complaint will be enforced if the issue was fully and fairly litigated at the hearing. *NLRB v. Sunnyland Packing Co., supra,* 557 F.2d at 1161; *Bob's Casing Crews, Inc. v. NLRB,* 458 F.2d 1301 (5th Cir.1972). The record shows that the matter was raised and fully litigated before the ALJ. The complaint contained general allegations of bad faith that "brought into question the general

---

16. *See* note 14, *supra.* Since we agree with the Board that no impasse existed at this stage of the negotiations, we need not address its alternative finding that any impasse that might have existed was caused by the Company's bad faith bargaining. *See NLRB v. Big Three Industries, Inc.,* 497 F.2d 43 (5th Cir.1974) (good faith bargaining is prerequisite to valid impasse).

17. This finding was not necessary to support the violation based on the Company's unilateral acts. Section 8(a)(5) may be violated through unilateral acts in the absence of an impasse without an affirmative finding of bad faith. *NLRB v. Katz, supra,* 369 U.S. at 743, 82 S.Ct. at 1111.

course of the Company's conduct" in negotiations. *NLRB v. Mayes Bros., Inc.,* 383 F.2d 242, 247 (5th Cir.1967). The Company was not unfairly surprised. At the hearing, the chief negotiators for both parties testified on the precise issue of the contract term. This evidence showed that throughout the negotiations, in each of four contract proposals, the Company insisted on a one year contract relating back to December 26, 1978, the certification date, and terminating on December 26, 1979. Thus, on November 2, 1979, the date of the Company's final proposal, the Company was willing to agree only to a contract of less than two months duration. The Company's lawyer and chief negotiator, Clinton, confirmed in direct testimony that this was in fact the Company's intention.[18] Insistence on a contract of unusually short duration is evidence of bad faith bargaining. *NLRB v. F. Strauss & Son, Inc.,* 536 F.2d 60, 64 (5th Cir.1976). Similarly, insistence on a contract drafted to expire on the certification anniversary tends to evidence bad faith. *Id.; NLRB v. Holmes Tuttle Broadway Ford, Inc.,* 465 F.2d 717, 719–20 (9th Cir. 1972) (seven-week contract expired on certification anniversary). The Company in this case insisted on both. The ALJ and the Board were justified in inferring from the evidence that the Company's position was a tactic to undermine the Union's status as employee representative.

The Board findings of bad faith were also based on the Company's bargaining as to dues check-off and arbitration. Contrary to the Company's strongly stated objections, these findings were not indicative merely of the Board's disapproval of the Company's demands.

> "In evaluating the parties' good faith, the Board is not precluded from examining the substantive proposals put forth. Indeed, '. . . if the Board is not to be blind-

ed by empty talk and by the mere surface notions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employer in the course of bargaining negotiations.'"

*NLRB v. F. Strauss and Son, Inc., supra,* 536 F.2d at 64 (quoting *NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 134 (1st Cir.), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953)).

After resisting the Union's demands for dues check-off and rejecting the Union's offers to reduce the effective period for the check-off from one year to three months, the Company finally proposed a check-off clause on April 11. Under this proposal, each employee could revoke his check-off authorization upon seven days notice and the entire check-off provision would lapse on the Union certification anniversary less than nine months away. The Company claimed that the proposal was made to avoid a strike. The ALJ rejected that justification, noting that the Company's proposal was made several days before the Company learned of an impending strike. We cannot say the ALJ's finding is erroneous.

■ The Company withdrew its check-off proposal immediately following the strike. While a company that has successfully weathered a strike may in some cases assert its confirmed bargaining strength by modifying its proposals, *see, e.g., NLRB v. Randle-Eastern Ambulance Service, Inc.,* 584 F.2d 720, 725–26 (5th Cir.1978), the ALJ found that Huck withdrew the check-off offer because it feared the Union might accept it and thereby draw the parties nearer a contract. While the evidence does not compel this conclusion, we are not convinced that it is an unreasonable inference. The strike revealed some weakness within the Union's ranks. The Union had approached the Company shortly after the

---

**18.** The Company argues that it mistakenly included the two-month provision in its November proposal by failing to change the termination date from earlier drafts. It argues that the ALJ erroneously rejected Clinton's offer of proof in the form of the Company's January 18 proposal of a one-year contract. The ALJ did not err in refusing evidence of a session held over one month after testimony began in this case. Moreover, even if that evidence would support an inference that earlier proposals were mistaken, it is directly contradicted by Clinton's own testimony.

strike to inquire if the check-off proposal was still open. In this situation, the Union might very well have sacrificed its desire for arbitration and accepted the Company's check-off provision. The parties' only major remaining difference then would have been wages. Shortly thereafter, the Company in fact decided that inflation warranted a pay raise. In these circumstances, the ALJ was justified in finding that the Company withdrew the check-off offer in bad faith to avoid resolution of its dispute with the Union.

Throughout the negotiations, the Company refused even to consider an arbitration provision. The ALJ recognized that insistence on this point does not necessarily violate the Act, but found that, when coupled with the Company's other demands, the position was so unreasonable as to be indicative of bad faith. Instead of arbitration, the Company offered a provision waiving the no-strike clause whenever the Union objected to a grievance decision. The waiver would not apply to "new jobs disputes" and insurance. The Board found that these proposals would put the Union in the "untenable position" of foregoing each unresolved grievance or striking and would also withdraw two areas of employment conditions from Union oversight. As the Company no doubt realized, a newly certified union cannot order a strike over each minor unresolved dispute and retain member support.

The Company insists that its contracts with the United Auto Workers do not allow arbitration and that this fact is evidence that its position is maintained in good faith. We agree. *Gulf States Manufacturers, Inc. v. NLRB,* 579 F.2d 1298, 1320 (5th Cir.1978). However, it is not dispositive in light of other positions the Company maintained.[19]

We do not mean to suggest that after the Board's order the Company must acquiesce to an arbitration clause. We doubt that substantial evidence of bad faith is shown by the Company's actions regarding arbitration alone. It may continue to "bargain hard." However, the ALJ and the Board were entitled to consider, and did consider, the totality of the Company's conduct in evaluating its good faith. *Sweeney & Co. v. NLRB,* 437 F.2d 1127, 1135 (5th Cir.1971). We find the Company's position on the duration of the contract particularly compelling evidence of bad faith, and we note that its disparate treatment of Union and non-Union employees on May 14 in violation of Section 8(a)(1) lends further support to the Board's finding. *Id.* Substantial evidence of bad faith was shown and we enforce this portion of the order.

## SUMMARY

We remand this case to the Board to restructure its order in accordance with this opinion. This will require modification of those parts of the order based on the May 15–18 doubletime payments, Mull's speech, and the posting of the wage proposal. We have not discussed all the alleged violations or all the inferences drawn by the Board from certain acts. However, our disposition of the major issues supports the Board's overall order and remedy except in the areas mentioned.

ENFORCED IN PART, VACATED IN PART, and REMANDED.

---

19. For example, the ALJ observed that the UAW contract contained a check-off clause.