SAUNDERS HOUSE a/k/a the Old Man's Home of Philadelphia, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–3594.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1983.

Decided Oct. 26, 1983.

Jacob P. Hart (argued), Robert F. Harchut, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for petitioner.

Susan L. Dolin (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before SEITZ, Chief Judge, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Saunders House (employer) petitions for review of an order of the National Labor Relations Board (NLRB or Board) holding that Saunders House violated section 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (5) (1976), by unilaterally increasing the wages of its employees. The employer argues that the wage increase did not constitute an unfair labor practice because at the time of the raise it had reached an impasse in its negotiations with District 1199C, National Union of Hospital and Health Care Employees, Division of RWDSU, AFL–CIO (union). The Board concluded that an impasse did not exist and cross-petitions for enforcement of its order. We grant the petition for review and deny enforcement.

### I.

Saunders House is a nonprofit Pennsylvania corporation that provides long-term health care at its Philadelphia facility. On August 28, 1980, following an election, the Board certified the union as the collective bargaining representative of the Saunders House employees. The union's president, Henry Nicholas, requested a meeting with the employer to discuss the terms of a collective bargaining agreement, and sent the union's initial proposal to Frank Abbott, the employer's attorney and chief negotiator. The union proposed a $40 per week wage increase, plus a cost-of-living adjustment (COLA), as well as a full union security provision and a checkoff for union dues and initiation fees.

The parties met for the first time on September 16, 1980. Abbott represented the employer and Nicholas negotiated for the union. Abbott promised the union that the employer would submit a counterproposal at the next bargaining session. He also inquired whether the union continued to object to a retroactive 8% wage increase. Nicholas responded that the union opposed

the raise unless it was part of an overall contract package.[1]

On September 19, 1980, the parties met for the second time and the employer presented a proposed contract that did not provide for either a union security clause or a checkoff provision. Wage proposals were not included, but Abbott explained that they would be forthcoming. At the next meeting on September 24, the employer asked to defer discussion of economic matters.

The parties held meetings on October 8, October 29, November 5, and November 12, at which the subject of wages was not discussed. In the course of these meetings, Donna Ford, executive vice-president of the union, replaced Nicholas as the union's negotiator and the Federal Mediation and Conciliation Service appointed Christine Sickles to aid in the negotiations.

On November 24, 1980, Sickles asked Abbott and Ford what could be done to further the negotiations. Ford said that the employer had to "do something" on wages, union security, and checkoff. Abbott promised to deliver a wage proposal at the next session, and replied that "the answer is still no" to union security and checkoff. Ford told Abbott that she could not proceed further until the employer moved on the three issues.

On December 2, 1980, Abbott presented the employer's wage proposal, which was a one-year contract effective the date of ratification with a COLA on July 1, 1981. The union proposed a modified wage increase of $20 per week retroactive to September 1980, an $18 weekly increase effective September 1981, an $18 weekly increase effective September 1982, plus a COLA in the second year of the contract.

The parties conducted further negotiations on December 8, December 22, and January 26. At these meetings, each party's position on economic issues remained unchanged. On February 6, 1981, during the twelfth session, Ford and Abbott agreed to meet privately.

The private meeting took place in Abbott's office on February 20, 1981. In this off-the-record meeting, lasting about thirty minutes, the parties reviewed their respective positions. Ford told Abbott that a contract between the parties could be reached if the employer would agree to a dues checkoff, a modified union security clause, and wage increases of 8% in each year of a three-year contract. Abbott replied that this would probably be unacceptable to his client, and that he would present a counterproposal at the next meeting.

On March 2, 1981, Abbott presented a proposal for a contract to expire on September 30, 1981. It included individual pay raises that would amount to an average of about 6½%. In addition, the employer offered an across-the-board 6% wage increase effective July 1 in lieu of a COLA. There were no union security or checkoff provisions. Furthermore, Abbott stated that the contract proposal was the employer's "final offer." Ford said that the union would study the proposal, but that it would not accept a contract that failed to provide for increases for all employees.

The parties next met on March 5. Ford presented the union's "final offer" on wages: increases of 8% retroactive to July 16, 1980, 10% effective on July 1, 1981, and 10% effective on July 1, 1982. There was no mention of a COLA. Abbott reiterated that the union already had the employer's final offer.

On March 16, 1981, the Federal Mediation and Conciliation Service set up a fact-finding board. Nicholas represented the union at the board hearing and proposed 8%, 10% and 10% increases *plus* a COLA. The union asked for a determination of seven issues: union security, checkoff, union activity, grievance procedures, wages, contract duration, and reinstatement of two previously

---

1. Although the union had indicated its opposition to the employer's suggestion of an immediate, interim 8% retroactive wage increase, the employer granted the wage increase to the unit employees on September 26. The union filed an unfair labor practice charge with the Board over the increase. The matter was settled by informal agreement and is not at issue here.

dismissed employees. Abbott restated the employer's position as of March 2, 1981.

The fact-finding board issued its non-binding recommendations on March 20, 1981. It called for a contract termination date of August 3, 1982, modified union security, a checkoff provision, and an across-the-board 8% wage increase effective September 1, 1981.

The next negotiating session took place on March 30. Ford told Abbott that the union would accept the modified union security provision and would drop its demand for reinstatement of the two previously fired employees. Abbott repeated that the union had the employer's final proposal.

On April 15, 1981, the parties met again. Nicholas, representing the union, submitted a written proposal. With respect to union activity, checkoff, and duration of the contract, there was no change from the position presented to the fact-finder. Nicholas included the modified union security provision that Ford had offered at the last meeting. On wages, the union asked for an 8% increase in each year. There was no demand for a COLA. Abbott asked for and received some clarifications. He then said that he would discuss the proposal with his client.

The next day, April 16, Abbott wrote Nicholas a letter that stated that the union's proposal presented no changes in its position. He again repeated the employer's final offer and informed the union that unless it accepted the employer's proposal by April 22, the employer would implement its proposed wage increase. On April 20, Nicholas responded that the union had changed its position with respect to wages, union security, and other items and therefore objected to any unilateral wage increase, asserting that such an increase would constitute an unfair labor practice.

Abbott tried unsuccessfully to contact Nicholas by telephone on April 21 and April 22. On April 22, Abbott sent Nicholas

a letter stating that because the parties remained at an impasse on the key issues, the employer would implement its wage proposal. That same day, the employer granted its employees wage increases averaging approximately 6½%. The union filed an unfair labor practice charge.

On October 24, 1981, the regional director of the Board issued a complaint alleging a violation of section 8(a)(1) and (5) of the National Labor Relations Act.[2] After an evidentiary hearing, the administrative law judge (ALJ) found that the employer had violated section 8(a)(1) and (5) of the Act. The employer excepted to the findings, including one that it had not acted in "good faith." The Board agreed with the employer's exception to the finding that it had not acted in "good faith," but nevertheless affirmed the ALJ's conclusions.

## II.

An employer violates section 8(a)(1) and (5) of the Act if it unilaterally changes a condition of employment that is the subject of negotiation. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). In *Huck Manufacturing Co. v. NLRB,* 693 F.2d 1176, 1186 (5th Cir.1982), the Fifth Circuit observed, "The principal exception to this rule occurs when the negotiations reach an impasse: when impasse occurs, the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the Union during bargaining." The parties in the present case agree that the employer unilaterally changed a condition of employment that was a mandatory subject of bargaining. Thus, the issue in dispute is whether there was an impasse.

The Board has defined impasse as a situation in which one party is "warranted in assuming . . . that the [other party] had abandoned any desire for continued negotiations, or that further good-faith bargaining . . . would have been futile." *Alsey*

---

**2.** Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain with the bargaining agent of its employees. Section 8(a)(1) makes it an unfair labor practice for an

employer to interfere with, restrain, or coerce its employees in the exercise of their rights guaranteed under the Act.

*Refractories Company,* 215 N.L.R.B. 785, 787 (1974). This court has recognized that the term impasse may be used to describe that point in labor negotiations in which there is sufficient disagreement over a mandatory subject of bargaining to permit unilateral action on the subject by one of the parties. *Latrobe Steel Co. v. NLRB,* 630 F.2d 171, 179 (3d Cir.1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 104, 70 L.Ed.2d 92 (1981).

■ Under Board policy, five general factors are considered in determining whether negotiations have reached an impasse. These include: "[t]he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations . . . ." *Taft Broadcasting Co.,* 163 N.L.R.B. 475, 478 (1967), *enforced sub nom. AFTRA, Kansas City Local v. NLRB,* 395 F.2d 622 (D.C.Cir. 1968). Each side argues at length that each of these factors supports its position. The Board resolved the issue of good faith bargaining in favor of the employer. Crucial to the decision in this case, however, is neither good faith, nor bargaining history, nor length of the negotiations, but rather the importance of the issues over which there remained disagreement and the extent of movement of the parties toward a negotiated settlement.

The employer argues that a deadlock on one critical issue can create an impasse. *NLRB v. Yama Woodcraft, Inc.,* 580 F.2d 942, 945 (9th Cir.1978). "Where good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock, the Board is warranted, . . . and perhaps sometimes even required, . . . to make a determination that an impasse existed." *Id.* at 944 (quoting *Dallas General Drivers, W. & H., Local No. 745 v. NLRB,* 355 F.2d 842, 845 (D.C.Cir.1966) ). Wages were obviously a major issue in the negotiations of this first labor contract between the parties. In *NLRB v. Tomco Communications, Inc.,* 567 F.2d 871 (9th Cir.1978), the court stated: "Those who bargain collectively are normally under an obligation to continue negotiating to impasse on all mandatory issues. The law relieves them of that duty, however, when a single issue looms so large that a stalemate as to it may fairly be said to cripple the prospects of any agreement." *Id.* at 881 (citation omitted). This court has held that the term impasse may "be used to refer to a breakdown in all negotiations over either one or several issues." *Latrobe Steel Co. v. NLRB,* 630 F.2d 171, 179 (3d Cir.1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 104, 70 L.Ed.2d 92 (1981).

### III.

The Board held that an impasse did not exist in this case because the union's April 15th proposal demonstrated movement in its position. The Board notes that movement on one important issue may support a finding that an impasse did not exist even though other key issues remain unresolved. Labor negotiations experience has demonstrated that a willingness to move toward an agreement on an important issue in dispute might trigger other concessions on related questions. *See NLRB v. Webb Furniture Corp.,* 366 F.2d 314, 316 (4th Cir.1966). As the court stated in *Huck Manufacturing Co. v. NLRB,* 693 F.2d 1176 (5th Cir.1982), "for a deadlock to occur, *neither party* must be willing to compromise." *Id.* at 1186.

Saunders House contended before the Board, as it does in this court, that the union's April 15th wage proposal was not new and was not a concession. The Board responded to the employer's contention:

> The Respondent contends that this is not a concession on the Union's part because it had been aware that such a proposal was acceptable after the February 20 meeting. We disagree. The Union's wage offer of April 15 offered now "on the record" and in conjunction with other proposals was a new offer on the Union's part and one showing a significant concession.

*Saunders House,* 265 N.L.R.B. No. 207, slip op. at 9, n. 6 (Dec. 16, 1982).

The Board stresses that determining whether there is a genuine impasse is a

"question of fact to which no mechanical definition can be applied." *Fairmont Foods Co. v. NLRB,* 471 F.2d 1170, 1173 (8th Cir. 1972). As such, it often depends on the mental state of the parties and is therefore "particularly amenable to the expertise of the Board as fact-finder." *Huck Manufacturing Co.,* 693 F.2d at 1186. In discussing the difficult question of determining when further bargaining on an issue is futile, the court in *Dallas General Drivers, W. & H., Local No. 745 v. NLRB,* 355 F.2d 842 (D.C. Cir.1966), aptly observed that in the complex realm of industrial relations "few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems." *Id.* at 844–45 (but noting that "[w]here good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock, the Board is warranted, and perhaps sometimes even required, to make a determination that an impasse existed").

The court must uphold the Board's conclusion that there was no impasse and that the employer committed an unfair labor practice if the Board's findings are supported by substantial evidence on the record as a whole. *Universal Camera Co. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). On the other hand, this court will not enforce the Board's ruling unless there is substantial evidence in the record to support its finding that there was no impasse. There were three key issues in dispute between the employer and the union from the very inception of their negotiations in September 1980: wages, union security, and checkoff. These issues were uppermost in the minds of the parties throughout the negotiations. The union adamantly insisted upon a checkoff provision, and the employer steadfastly opposed its inclusion. On union security, the union altered its position from a demand for full union security to a modified union security proposal. The union informed the employer of this change at the off-the-record meeting on February 20 and then presented it formally on March 30. The employer continued to refuse to include any union security provision. The modification by the union and the employer's rejection of the attempted compromise occurred before the April 15th final session and the employer's subsequent wage increase.

Although it is clear that the parties were at impasse on the union security and checkoff provisions, the question of whether wages were deadlocked is more difficult to resolve. On February 20, union representative Ford told employer representative Abbott in the off-the-record session that the union would be willing to accept a three-year contract with provisions for 8% wage increases each year. This offer was rejected by the employer on March 2 when it proposed an alternative plan for a contract of less than one year with wage increases varying by employee but averaging about 6½%. In the negotiations that followed, the union progressively lowered its on-the-record demands. On April 15, the union president produced a written proposal for a three-year contract with provisions for an 8% wage increase in each year. This wage offer was identical to the one provided off the record on February 20, but it constituted significant movement from the unions prior announced position.

A concession by one party on a significant issue in dispute precludes a finding of impasse even if a wide gap between the parties remains because under such circumstances there is reason to believe that further bargaining might produce additional movement. The new proposal must be one that should encourage the parties to believe that further negotiations would not be futile. If, however, it does not bring the parties any closer than they were previously (albeit because of an off-the-record conversation), it is difficult to perceive how the on-the-record position provides an incentive to continue bargaining in the belief that a settlement is nearer.

IV.

We conclude that a mere shift from a position off the record to one on the record is not a concession sufficient to preclude a finding of impasse. The union did

not propose anything on April 15 that it had not presented to the employer at an earlier date; there was in fact no real movement and the employer so notified the union by letter the next day. Furthermore, the employer put the union on notice in that letter that unless the Saunders House final offer was accepted by April 22, it would put the proposed wage increase into effect. This increase was not greater than the one offered by the employer at the bargaining table. The union, however, continued to adhere to its position.

There is not substantial evidence in the record to support the Board's conclusion that the parties were not at impasse and that the employer's unilateral wage increase constituted an unfair labor practice. The petition of Saunders House will be granted and the Board's cross-petition for enforcement will be denied.