**HARDING GLASS INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1371.

United States Court of Appeals, Tenth Circuit.

Feb. 24, 1982.

Stanley E. Craven, Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioner.

Charles P. Donnelly, Atty., N. L. R. B., Washington, D. C. (Kenneth B. Hipp, Deputy Asst. Gen. Counsel, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., with him on brief), for respondent.

Before HOLLOWAY and DOYLE, Circuit Judges, and KUNZIG,* Judge.

---

* Honorable Robert L. Kunzig, Judge of the United States Court of Claims, sitting by designation.**

** Due to the fact that this case was held in abeyance pending the Supreme Court's decision in a related case, Judge Kunzig did not

WILLIAM E. DOYLE, Circuit Judge.

This is a labor relations case in which the principal question is whether the petitioner, who seeks review and reversal of the National Labor Relations Board's order, committed an unfair labor practice by an untimely withdrawal from a multi-employer bargaining unit, and by subsequent refusal to be bound by a collective bargaining agreement. Also at issue is whether petitioner's failure to reinstate employees following a strike constitutes an unfair labor practice. The Board has cross-petitioned for enforcement of its order.

## I.

### Factual Background

Petitioner was a member of a multi-employer bargaining unit consisting of four members, PPG Industries, of Topeka, Kansas; Harding Glass of Topeka; Warner Glass Company of Topeka, and Harding Glass of Manhattan, Kansas. The organization was known as the Topeka Area Glazing Contractors Association. It represented its members in collective bargaining with Glaziers and Glassworkers Local Union No. 558. Hugo Townsend served as chairman of the Association's negotiating team, and Jack Zander headed negotiations for the Union.

On July 31, 1977, the then-current collective bargaining agreement was due to expire and the parties started negotiations on a new contract. They held meetings on July 20th, 26th, 27th and 29th. No agreement was reached and the Union went on strike August 1, 1977. However, Warner and the Union agreed orally that Warner's employees would continue to work under the terms of the expired contract and that Warner would pay retroactively any wage increases negotiated by the Association. Thereafter, on October 20th, Warner and the Union apparently signed a written contract, wherein Warner agreed to begin paying a new wage scale, and agreed to other terms which were requested by the Union.

Other meetings between the Association and the Union took place on August 5th

and 17th. · By mutual consent, a mediator from the United States Mediation and Conciliation Service started attending meetings on August 5th. The Administrative Law Judge found that:

On August 17, 1977, the Association presented further proposals. At that time, the parties were in disagreement over several substantial issues: wages, holidays, a surety bond, hiring hall, and rotation. Rotation involved a union proposal for sharing the work in slack times, rather than laying off employees. It was resisted by the Association and the Respondent, and particularly opposed by the management of the Manhattan branch, though Project Manager Galbraith testified that such a policy was normally followed at Manhattan. In addition, the Association was insisting that its proposals, including the Respondent's position on rotation, be submitted to the Union membership for vote—a demand adamantly resisted by the Union representatives.

During the August 17 meeting, which concluded in a heated discussion regarding the rotation issue, Union representative Zander said, in apparent exasperation, that if it were not for Manhattan and the rotation issue, "we could settle this damn thing" and that it "might be better" if the Union negotiated separately with Manhattan.

Despite the position that had been taken at the meeting, the Union submitted the Association's proposal to the membership for a vote on the evening of August 17th. The proposal was rejected by a vote of 16 to 1.

On August 22nd, Vic Galbraith, the Contract Manager for Harding Manhattan, telephoned Jack Zander, the Business Manager for the Union, who represented the Union during the negotiations. Bobby Atchison, Manager of Harding Topeka, participated in the call. Galbraith asked if Zander agreed that the negotiations were at a "standstill" and Zander replied that he guessed so. Galbraith then said that Har-

participate in this opinion because of his un- timely death.

ding Manhattan should negotiate separately; Zander suggested a meeting to discuss the matter.

The next negotiation session was August 24th. At the beginning of the meeting, Galbraith handed Zander a letter from Joe Jones, Manager of Harding Manhattan. The letter informed the Union that Harding Manhattan was withdrawing from the multi-employer negotiations "because of the impasse and your suggestion." Zander indicated that he did not know whether the withdrawal could be permitted, and left the meeting to telephone the Union's attorney. Galbraith left the meeting while Zander was absent. No separate representative of Harding Manhattan was present at any further meetings between the Union and the Association. Zander returned and stated that the Union would not allow Harding Manhattan to withdraw. The meeting broke up without any discussion of substantive issues.

In response to a Union proposal of new language for a rotation clause, a meeting was held September 19th. Further meetings were held October 27th and November 3rd. Agreement was finally reached on November 3rd, and the Association and the Union entered into a new three-year contract. The agreement did not contain a rotation clause.

On November 7, 1977, all the strikers reported for work. At Harding Manhattan, Jones refused to allow them to return to work on the ground that Manhattan had no contract with the Union. On November 20th, Jones and Galbraith offered the former strikers employment on terms and conditions less favorable than those contained in the new agreement. This offer was declined. At the hearing before the Administrative Law Judge, the company argued for the first time that it had hired permanent replacements for all of the strikers prior to November 7th, and that there were no openings available on that date. It was undisputed that Manhattan hired two employees on August 22nd and five more between September 19th and October 31st.

Following the presentation of evidence, including exhibits, before the Administrative Law Judge, a decision was reached and recommended remedies were set forth. The remedies were substantially accepted by the Board. Harding Manhattan was ordered, in part, to abide by the agreement, and to reinstate and make whole those employees who had requested reinstatement. Harding asks that the Board's decision be reversed and that the order be denied enforcement. The argument of Harding is that it validly withdrew from negotiations, and therefore, it is not bound by the agreement. In the alternative, Harding argues that the strikers are not entitled to reinstatement or back pay.

## II.

### Was the Withdrawal of Harding-Manhattan Valid?

The position of Harding Manhattan is that there was an impasse, which, either by itself or in combination or with other circumstances, justified Manhattan's withdrawal from multi-employer bargaining. The Administrative Law Judge and the Board found, however, that no impasse in negotiations had been reached. Nevertheless, Harding argues that this finding is not supported by substantial evidence on the record as a whole. It is unnecessary, in view of the disposition which we make, to resolve this question. We assume that the parties were at an impasse on August 24, 1977. *Taft Broadcasting Company*, 163 N.L.R.B. 475 (1967), *petition dismissed sub nom., American Federation of Television and Radio Artists v. NLRB*, 395 F.2d 622 (D.C.Cir.1968).

Multi-employer bargaining is approved expressly by the National Labor Relations Act, and is said to serve an important role in promoting labor peace. *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); *NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55 (10th Cir. 1966). The Board has developed rules restricting withdrawal from such units, in the interest of supporting such multi-employer bargaining units. In gener-

al, withdrawal is prohibited after the bargaining commences; prior thereto it is permitted if made unequivocally and in good faith. Retail Associates, Inc., 120 N.L.R.B. 388 (1958); Pacific Coast Association of Pulp & Paper Manufacturers, 163 N.L.R.B. 892 (1967). After bargaining begins, the Board prohibits withdrawal absent "consent" or "unusual circumstances." This court in *NLRB v. Johnson Sheet Metal, Inc.*, 442 F.2d 1056 (10th Cir. 1977) has expressed approval of these guidelines.

Manhattan Harding has not argued directly that the Union consented to withdrawal. It has been suggested that the Union, through Zander, invited the withdrawal. As noted above, Zander said on August 17th that it might be possible to reach a settlement if Harding Manhattan was not part of the negotiations. Thereafter, however, Zander offered only to discuss the matter further. When confronted with Manhattan's withdrawal on August 24th, Zander unequivocally refused to consent to the withdrawal.

■ Where a union accepts benefits flowing from a withdrawal or proceeds to bargain individually without protest, it may be appropriate to infer consent to withdrawal. *Fairmont Foods Co. v. NLRB*, 471 F.2d 1170 (8th Cir. 1972); Louisville Plate Glass Co., Inc., 243 N.L.R.B. 1175 (1979), *enforced* 657 F.2d 106 (6th Cir. 1981). We hold, however, that Zander's angry remarks at the end of a heated bargaining session in no way constituted consent. Moreover, we reject the view that such remarks ought to be treated as an offer capable of creating a binding contract if it is accepted prior to withdrawal. Prior to Harding Manhattan's withdrawal, Zander indicated that the Union was willing to discuss the matter further, a position suggesting the possibility that the Union would not consent. Indeed, when Manhattan actually attempted to withdraw, the Union expressed its unequivocal protest. *Compare, NLRB v. Callier*, 630 F.2d 595 (8th Cir. 1980). In view of the fact that there was no unequivocal consent to withdrawal here, it cannot be said that consent occurred. Heated remarks which are later modified before actual withdrawal do not constitute consent.

■ Manhattan's withdrawal was permissible only if "unusual circumstances" were present. The Board's position is that unusual circumstances arise only in extreme situations. The Board allows withdrawal if an employer is confronted with dire economic consequences, such as imminent bankruptcy. Joseph J. Callier, d/b/a Callier's Custom Kitchens, 243 N.L.R.B. No. 143 (1979), *enforced in part, NLRB v. Callier, supra*; United States Lingerie Corp., 170 N.L.R.B. 750 (1968); Spun-Jee Corp., 171 N.L.R.B. 557 (1968). The Board also would permit a non-consensual withdrawal where substantial fragmentation of the bargaining unit leaves the unit no longer viable. *See* Joseph J. Callier, d/b/a Callier's Custom Kitchens, *supra*; Tobey Fine Papers of Kansas City, 245 N.L.R.B. No. 181 (1979); *enforced* 91 Labor Cases (CCH) Par. 12,701 (8th Cir. 1981); Connell Typesetting Co., 212 N.L.R.B. 918 (1974). But absent such facts, the Board has refused to sanction withdrawals from multi-employer units, in an effort to preserve the stability and integrity of such units.

In Hi-Way Billboards, Inc., 206 N.L.R.B. 22 (1973), *enforcement denied*, 500 F.2d 181 (5th Cir. 1974), the Board took the position that an impasse in negotiations does not constitute an unusual circumstance which justifies withdrawal. There are a few Courts of Appeals decisions which have disagreed with the Board and have held that impasse alone justifies withdrawal from a multi-employer unit. Other appellate decisions have held that impasse in combination with other circumstances justifies withdrawal. Recently, the Board has clarified its position in this area, with the approval of two appellate courts. The issue is one of first impression in this circuit. In *NLRB v. Tulsa Sheet Metal Works, Inc., supra*, it was contended that impasse justified withdrawal, but we found that no impasse existed. And in *NLRB v. Johnson Sheet Metal, Inc., supra*, the issue was again left undecided because we found that any impasse had ended by the time of withdrawal.

In a case which preceded Hi-Way Billboards, Inc., *supra,* the Eighth Circuit Court of Appeals relied on earlier Board decisions to find that impasse justified withdrawal. *Fairmont Foods Co. v. NLRB, supra.* It is to be noted that the court in *Fairmont Foods* held alternatively that the union had consented to the withdrawal. A careful reading of *NLRB v. Beck Engraving Co., Inc.,* 522 F.2d 475 (3d Cir. 1975) reveals that the court there held that impasse alone will permit withdrawal from a multi-employer unit. Although the court was concerned with the whipsaw impact of separate agreements and selective strikes, the court did not condition the right to withdraw on such circumstances. Under *Beck Engraving* the right to withdraw accrues on impasse.

The Second Circuit has held that impasse justifies unilateral withdrawal from multi-employer bargaining in *NLRB v. Independent Ass'n of Steel Fabricators,* 582 F.2d 135 (2d Cir. 1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). In that case, negotiations of separate agreements with members of the association in question had occurred. However, the Second Circuit rested its holding on the fact of impasse. *See also NLRB v. Acme Wire Works, Inc.,* 582 F.2d 153 (2d Cir. 1978).

The Ninth Circuit apparently has held that impasse alone justifies withdrawal from a multi-employer unit. *See NLRB v. Associated Shower Door Co., Inc.,* 512 F.2d 230 (9th Cir. 1975), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). There the court ruled that where impasse is accompanied by selective picketing and negotiation of substantial individual agreements with some members of the employer association, withdrawal without consent is permitted. However, in *H & D, Inc. v. NLRB,* 633 F.2d 139 (9th Cir. 1980) (withdrawn from publication), the court, without discussion, states that "impasse in negotiations [is] justification for a unilateral withdrawal from a multi-employer unit." *See also, Authorized Air Conditioning Co. v. NLRB,* 606 F.2d 899, 907 (9th Cir. 1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980).

The courts which have endorsed withdrawal based on impasse alone have, nevertheless, recognized the importance of multi-employer bargaining to labor peace, and the resulting desirability of stability in multi-employer units. *See NLRB v. Truck Drivers Local Union No. 449, supra.* Those courts have found that the need for stability of bargaining units is outweighed by other considerations on impasse. The courts have focused primarily on the union's right to, in effect, withdraw by entering into separate agreements with individual employers, on the perceived futility of insisting that employers remain in the unit after impasse, and on the danger that, after impasse, the union will enter into separate agreements with individual employers and then unfairly "whipsaw" remaining employers by use of selective strikes.

After careful consideration of the views of the courts which have found impasse alone to be sufficient for withdrawal, we are persuaded that the better view is that impasse alone does not justify withdrawal. Our view is supported by the decisions of courts which have considered whether impasse, in combination with other circumstances, justifies withdrawal.

In *NLRB v. Hi-Way Billboards, Inc.,* 500 F.2d 181 (5th Cir. 1974), the court refused enforcement of a Board order in a case where impasse was accompanied by an "unfair whipsaw effect." The union had negotiated interim contracts with some employers and had struck others during an impasse. But in *NLRB v. Marine Machine Works, Inc.,* 635 F.2d 522 (5th Cir. 1981), the Fifth Circuit overruled the *Hi-Way Billboards* decision. An employer had withdrawn during impasse in negotiations. Its formal notice explicitly cited impasse as justification for the withdrawal. The Fifth Circuit held that withdrawal, solely because of impasse, violates § 8(a)(1) and (5) of the N.L.R.A. as a matter of law. The court went further and indicated its approval of recently clarified Board rules which continue to prohibit withdrawal on impasse, even where separate interim contracts have been negotiated with some members of the employer association.

With regard to separate agreements between a union and individual members of multi-employer bargaining units, the Board now takes the view that interim agreements do not seek to fragment the unit, but rather affirm its continued viability. Examples of such holdings are Joseph J. Callier, d/b/a Callier's Custom Kitchens, *supra*; Charles D. Bonanno Linen Service, Inc., 243 N.L.R.B. No. 140 (1979), *enforcement granted*, 630 F.2d 25 (1st Cir. 1980), *cert. granted*, 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). Interim agreements are those agreements which are temporary, and which contemplate that the union and the individual employer will ultimately be bound by the contract negotiated with the multi-employer association. The Board's position on this point is consistent with earlier decisions in the area, such as Sangamo Construction Co., 188 N.L.R.B. 159 (1971) and Plumbers & Steamfitters Union No. 323, 191 N.L.R.B. 592 (1971).

The Board has also taken the position that where a union and a member of a multi-employer unit enter into a separate permanent agreement, both the union and the company violate the N. L. R. A. unless they obtain the consent of the other members of the employer unit. Teamsters Union Local No. 378, 243 N.L.R.B. No. 138 (1979); Joseph J. Callier, d/b/a Callier's Custom Kitchens, *supra*. This rule appears to be a departure from the Board's previous position that the consents of the union and the individual employer were sufficient. *See* Charles D. Bonnano Linen Service, Inc., *supra*, 243 N.L.R.B. No. 140, n. 6. *But see* Local Union No. 103, 195 N.L.R.B. 980 (1972), *enforced NLRB v. Ironworkers*, 69 Labor Cases (CCH) Par. 13,169 (7th Cir. 1972).

The Board, however, continues to take the view that the fact that some members of a multi-employer unit have withdrawn does not necessarily justify additional withdrawals by other members. Tobey Fine

Papers of Kansas City, *supra*. The Board permits withdrawal when a unit becomes so fragmented that it is no longer viable. Typographic Service Co., 238 N.L.R.B. No. 211 (1978); Connell Typesetting Co., *supra*. The Fifth Circuit has approved the Board's rules as striking a fair balance between "an individual party's legitimate interest in striking its own separate bargain against the parties' and the public's legitimate interest in achieving the benefits afforded by continued multi-employer bargaining * *." 635 F.2d 526.

One other circuit has recently considered the Board's rules in this area.[1] In *NLRB v. Charles D. Bonanno Linen Service, Inc.*, *supra*, the First Circuit suggests that in refusing to accept the Board's rules in this area, the courts have improperly attempted to weigh the bargaining strength of the parties and to catalogue the economic weapons available to each. Furthermore, the court suggests that the courts have over-estimated the impact of interim agreements in fragmenting or weakening a bargaining unit. Because no interim agreements had been negotiated in *Bonanno*, the court did not find it necessary to rule on the question in that case. The only justification for withdrawal that was advanced was the existence of a bargaining impasse. The court ruled that impasse alone does not justify withdrawal. We agree.

The First Circuit in *Bonanno* observed that the whipsaw impact of interim agreements and selective strikes does not have a logical connection with impasse; impasse can exist without any whipsaw effect occurring, as was true in the *Bonanno* case. Conversely, a union may engage in strikes and enter into interim agreements even though negotiations have not reached impasse. Most of the concerns which the courts have voiced in relation to impasse are actually related to separate contracts and selective strikes. There is no reason to

---

1. In *NLRB v. Callier*, 630 F.2d 595 (8th Cir. 1980), the court indicated that the Board's rules may be too narrow and that interim agreements coupled with strikes might well fragment a bargaining unit so as to justify withdrawal. However, because the court found that the company's failure to give unequivocal notice of withdrawal rendered its withdrawal ineffective in any event, it did not decide the question.

hold that impasse alone triggers a right to withdraw that is actually based on other concerns. The court in *Bonanno* points out that impasse may be manipulated by a party desiring to withdraw. Also, impasse is difficult to define.

Some of the courts have suggested that it is futile to insist on continued participation in a multi-employer unit after impasse. We disagree. The fact that impasse occurs at one or more points in negotiations does not mean that an employer association and a union will not ultimately reach agreement. During the impasse, changed circumstances or economic pressures arising from strikes, lockouts, or sheer lapse of time, may cause adjustments which result in eventual agreement. In addition, the recognized importance of multi-employer units to labor peace must be considered. At least so long as other circumstances do not render it unfair or destructive to insist on continued membership in a multi-employer unit, we do not view impasse as a situation justifying withdrawal.

■ Harding Manhattan maintains in this appeal that the agreement with Warner Glass is an additional circumstance to which this court ought to give considerable weight in determining whether the withdrawal was permissible. But the effect of the Warner Glass agreement is not properly before us. As previously noted, the Union went on strike August 1, 1977. At about that same time, the Union and Warner Glass entered into an oral agreement and Warner's employees remained at work. Neither Harding Manhattan nor any of the other Association members ever expressed any protest or concern over the Warner Glass agreement. When Harding Manhattan submitted its notice of withdrawal on August 24th, that letter referred only to the impasse and the Union suggestion. Later, in response to the Board's request for a "complete written account of the facts" and a statement of Harding's position, Harding

Manhattan did not once mention the Warner Glass agreement in its two page reply letter.

Nor was the argument ever presented to the Administrative Law Judge or the Board. As a result, the record is devoid of any information important to consideration of the Warner Glass agreement. The record shows that out of a total of twenty-one or twenty-two Union employees in the bargaining unit, Warner Glass employed only four. There is no evidence in the record regarding what impact on the other three unit members was created, if any, as a result of the fact that Warner Glass continued to work during the strike. Furthermore, the Board distinguishes between permanent and interim agreements. Such an element was not explored below and we are unable to make a fact determination for the first time in this court on the record which is before us.[2] Therefore, in order to find for Harding Manhattan on this point, we would have to hold that any separate agreement with a member of a multi-employer group, whether interim or permanent, regardless of actual impact on the other unit members, and in spite of a lack of protest from any unit member, justifies withdrawal on impasse as a matter of law.

Because the Warner Glass agreement is advanced before this court as an afterthought, we need not and do not decide whether or not separate agreements justify withdrawal on impasse. In *NLRB v. Custom Wood Specialties, Inc.*, 622 F.2d 381 (8th Cir. 1980), a member of a multi-employer unit had withdrawn from negotiations, and the only fact cited in justification was that an employee had filed a decertification petition. The fact that the union and some employers had entered into interim agreements was not raised until Board proceedings commenced. The court found that the withdrawal

> may be considered to be an after-thought * * *. It cannot reasonably be considered the reason for the withdrawal.

2. The Board maintains that the written agreement executed in October, 1977 was understood to be temporary, pending execution of an agreement with the Association. Harding argues that on its face, the contract is for three years and is not temporary. However, the document in the record is unsigned and does not even specify who the contracting parties are.

*NLRB v. Central Plumbing Co.*, 492 F.2d 1252, 1254, n. 3 (6th Cir. 1974); *NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55 (10th Cir. 1966). * * *

Based on the cited authorities from other circuits, we conclude that the soundness of a withdrawal from a multi-employer unit is to be tested by considering the actual motivation of the employer seeking to withdraw from the unit. The record in this case lacks any showing that respondent's departure from the bargaining unit was motivated by anything other than * * * the certification petition. 622 F.2d at 385.

In *NLRB v. Tulsa Sheet Metal Works, Inc.*, *supra*, this court rejected the argument that an employer's refusal to be bound by a union-employer association contract was justified by two illegal clauses in the contract. The clauses had not been raised at the time of the withdrawal, but were raised later as an after-thought.

Therefore, we decline to consider the argument that the Warner Glass agreement, coupled with impasse, justified the withdrawal of Harding Manhattan. We have already reached the conclusion that impasse alone does not justify withdrawal from a multi-employer unit. Accordingly, we uphold the Board's finding that Harding Manhattan's withdrawal was in violation of § 8(a)(1) and (5) of the N. L. R. A.

### III.

*Was the Order of Reinstatement and Back Pay Valid?*

Harding Manhattan argues that even if its withdrawal from the bargaining unit violated the N. L. R. A., the strike did not thereby become an unfair labor practice strike. Since the strikers were replaced before the strike ended, it is Harding's position that they are not entitled to reinstatement. In addition, Harding argues that the award of back pay in this case is punitive and ought not to be enforced.

■ The rules regarding reinstatement following strikes are well-established. Economic strikers are entitled to reinstatement unless the employer can demonstrate that there were legitimate and substantial business justifications for a refusal to reinstate. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *Serv-Air, Inc. v. NLRB*, 395 F.2d 557 (10th Cir. 1968), *cert. denied*, 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968). If permanent replacements have been hired before strikers make an unconditional offer to return to work, the employer has a legitimate and substantial justification for refusing to reinstate the strikers. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

■ Unfair labor practice strikers are entitled to reinstatement regardless of whether or not they have been replaced. *NLRB v. International Van Lines*, 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). A strike which is based in part on economic causes will be deemed to be an unfair labor practice strike for purposes of reinstatement if unfair labor practices become a factor in the strike. The question on review is whether substantial evidence on the record as a whole supports a Board finding that the strike was an unfair labor practice strike. *Head Division, AMF, Inc. v. NLRB*, 593 F.2d 972 (10th Cir. 1979).

What is the nature of the impact which unfair practices need to have in order to transform an economic strike into an unfair labor practices strike? This court has said that the unfair labor practices must be one of the operative causes of the strike. *Head Division, AMF, Inc. v. NLRB*, *supra*; *NLRB v. Wichita Television Corp.*, 277 F.2d 579 (10th Cir. 1960), *cert. denied*, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 (1960). In *NLRB v. Windham Community Memorial Hospital*, 577 F.2d 805 (2d Cir. 1978) and *NLRB v. Acme Wire Works, Inc.*, *supra*, the court said that if an unfair practice prolongs or aggravates the strike, then it becomes an unfair labor strike. Another court has said that the question is whether the strike expands to include a protest over the unfair labor practices. *NLRB v. Top*

*Manufacturing Co., Inc.*, 594 F.2d 223 (9th Cir. 1979). In *NLRB v. Safway Steel Scaffolds Co. of Georgia*, 383 F.2d 273 (5th Cir. 1967), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968), the court emphasized the factor of prolongation of the strike.

■ In the case before us, the strike began solely as an economic one. On August 1st the work stoppage was called by the Union due to the fact that no agreement had been reached following discussions. The action was taken in the hope of pressuring the Association to accept Union terms. In light of the analysis above, the withdrawal of Harding Manhattan on August 24th was clearly an unfair labor practice. Harding argues that the economic strike would have continued regardless of the withdrawal until November 7th. The testimony of Union Representative Zander supports this contention. Harding contends that as a result, the strike was solely an economic strike, at least until November 7th. Harding also maintains that all strikers were permanently replaced before November 7th, so they were not entitled to reinstatement on that date.

From a review of the record we find that substantial evidence supports the Board's determination that the strike became an unfair labor strike when Harding Manhattan withdrew from negotiations. On that occasion, the unlawful refusal to bargain became at least as significant from the viewpoint of Harding Manhattan employees as the effort to obtain favorable economic terms. Thus, the Board could infer that the refusal to bargain became an operative cause of the strike against Harding Manhattan as of the date of the withdrawal.

*NLRB v. Johnson Sheet Metal, Inc., supra*, was a case similar in many respects to the one which we now consider. There we sustained a similar Board finding, and we are persuaded that the same result should obtain here.[3]

The Administrative Law Judge and the Board found that the two replacements hired August 22nd were hired in anticipation of the August 24th withdrawal. In light of the timing and the conversation between Galbraith and Zander on August 22nd, this inference is supported by the record. It is undisputed that all of the other replacements were hired after August 24th. Thus, the Harding Manhattan employees were entitled to reinstatement when they reported for work on November 7th.

■ Finally, it is argued by Petitioner that the award of back pay is punitive for the reason that Harding Manhattan offered the strikers work under the terms of the old contract on November 20th. But the Board held that the November 20th offer was invalid in view of the fact that Harding Manhattan was bound by the new contract. The strikers were not obligated to accept work under terms and conditions inferior to those which they were entitled to in order to protect their rights under the Act. As the Board points out, the employees were under a duty to minimize their damages. The award of reinstatement and back pay is, therefore, not punitive and is fully in accord with the Act. This is the reasoning of the Labor Board and we agree with it.

The petition for review filed by Harding Glass is dismissed, and the cross-application for enforcement is, therefore, granted.[4]

3. Although no express finding was made, the Administrative Law Judge apparently also found that Harding did not carry its burden of proof to demonstrate that legitimate and substantial business reasons justified the refusal to reinstate. Thus, the Administrative Law Judge apparently found that regardless of whether the strike was an economic or unfair labor practices strike on November 7th, Harding did not demonstrate that the refusal to reinstate was based on the hiring of permanent replacements. It is true that Harding's former employees were told that they could not return to work because there was no contract with the Union. The fact that replacements were hired was not raised until the hearing before the Administrative Law Judge. We need not decide whether Harding failed to carry its burden on this point in light of the disposition reached.

4. *The Charles D. Bonanno Linen Service, Inc. v. National Labor Relations Board, et al.*, —— U.S. ——, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), which has been before the Supreme Court of

the United States, is somewhat similar to the *Harding Glass Industries, Inc.* case. Like our case, it involved a withdrawal from an employers' association. Due to the factual similarity of the two cases, our opinion was held in abeyance pending the Supreme Court's ruling. The Supreme Court in *Bonanno* ruled that the withdrawal by the Bonanno Company from the employers' association was not justifiable; that it constituted an unfair labor practice in violation of § 8(a)(5) and (1) of the National Labor Relations Act. In *Bonanno* there was admittedly an impasse which was held by the Court to be not sufficiently destructive of group bargaining to justify withdrawal. To allow withdrawal based on impasse was held to undermine the utility of multiemployer bargaining. Our examination of the *Bonanno* opinion does not reveal any ruling or conclusion which tends to undermine our opinion in *Harding Glass Industries, Inc. v. National Labor Relations Board.*