**TEAMSTERS LOCAL UNION NO. 175, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Bell Transit Company, Intervenor.**

No. 84–1584.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1985.

Decided April 15, 1986.

---

Wilma B. Liebman, with whom Robert M. Baptiste, Washington, D.C., was on brief, for petitioner.

Daniel R. Pollitt, Atty., N.L.R.B., of the Bar of the Supreme Court of North Carolina, pro hac vice by special leave of the Court, with whom Robert E. Allen, Associate General Counsel and Elliott Moore, Deputy Associate General Counsel, Washington, D.C., were on brief, for respondent.

David M. O'Boyle, Pittsburgh, Pa., for intervenor, Bell Transit Co.

Before WRIGHT and EDWARDS, Circuit Judges and DAVIS,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The instant case involves an unfair labor practice charge filed by Teamsters Local Union No. 175 ("Local 175" or the "Union") with the National Labor Relations Board ("NLRB" or the "Board"), alleging that Bell Transit Company ("Bell Transit" or the "Company") violated section 8(a)(5) of the National Labor Relations Act ("NLRA" or the "Act") when Company officials unilaterally reduced the wage rate of bargaining unit employees prior to reaching a new agreement or a bargaining impasse with the Union. An Administrative Law Judge ("ALJ") found that representatives of Bell Transit thought an agreement with the Union was imminent at the time when wages were reduced. Therefore, the ALJ concluded that bargaining had not reached an impasse and that Bell Transit's wage reduction had been an unfair labor practice in violation of the Act. Although it did not overturn any of the ALJ's findings of fact, the Board reached an extraordinary and concededly unprecedented conclusion that the negotiating parties were at an impasse while they simultaneously had reached a tentative contract agreement. Accordingly, the Board dismissed the Union's complaint.

We find the Board's decision to be completely unsupportable. It is undisputed that the employer's negotiator believed that he had reached a tentative agreement with the Union. Furthermore, the findings do not support a conclusion that the Union thought bargaining was deadlocked. Moreover, neither bargaining party took any action indicating that further bargaining would have been fruitless. Thus, on this record, there was no legal justification for the employer's unilateral action in reducing wages. The Board's conclusion that an impasse and tentative agreement can exist simultaneously is both inconsistent with prevailing law and, additionally, incomprehensible. We therefore reverse and remand to the Board.

## I. BACKGROUND

Bell Transit hires and supervises truck drivers for its sole customer, Union Carbide. From 1956 to 1982 the Company employed members of Local 175 for work at Union Carbide's Institute, West Virginia plant under National Master Freight Agreements negotiated between a multi-employer association and affiliated local unions. When Bell came under pressure from Union Carbide to lower labor costs, it withdrew from the association. Local 175 was then authorized by the Teamsters to negotiate a separate agreement with Bell, subject to the approval of the Eastern Conference Rider and Contract Review Committee ("Eastern Conference").

Bell and the Union first met to negotiate on March 5, 1982, but Bell did not offer a contract proposal at that meeting. With the National Motor Freight Agreement about to expire on March 31, 1982, Bell Transit sent a letter to Local 175 on March 26, agreeing to continue to pay the wage rate of $12.68 per hour that had been in effect under the expiring agreement. In exchange, it expected the drivers to continue working during negotiations on a new contract. Bell also agreed to increase its fringe benefit contributions on April 1 as scheduled under the national agreement, but did not offer to implement scheduled cost-of-living increases that would raise wages to $13.15 per hour. The Company

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

stated that it would pay the wage rates agreed on in the upcoming negotiations retroactively to April 1.

The negotiating parties met again April 5, 6 and 7. On April 7, the Company made its first wage offer at $9.71 per hour with an annual reopener. The Union requested the $13.15 per hour it would have received under the national agreement. On May 4, the parties returned to the bargaining table and Bell Transit made a so-called "final offer" of two alternative wage proposals: $10.50 per hour with an annual reopener or $11.00 per hour without a reopener. The Union maintained its original demand. At the next negotiating session on May 7, Bell again raised its offer. It proposed a wage rate of $11.25 per hour with a reopener in the third year.

After bargaining with Bell on May 7, the Union held a meeting of the drivers and took a straw pool to assess sentiment on the Company's latest proposal. The vote was split evenly. On May 11, one of the Union negotiators telephoned Max Rein, Bell's president and negotiator, and told him of the split vote. The Union agent informed Rein that the vote meant the drivers had *not* rejected the proposal and reminded him that the contract would have to be approved by the Eastern Conference. When asked at the hearing what his response had been to this news, Mr. Rein testified, "Well, I felt as long as the men didn't reject it, we had a good chance." Joint Appendix ("J.A.") 301.

On May 14, Rein notified the Union that Bell would implement its May 7 contract proposal, reducing wages to $11.25 per hour. On May 16, without agreement from the Union, the company unilaterally reduced the wage rate to $11.25 per hour. Local 175's negotiators submitted Bell's wage proposal to the Eastern Conference

on June 11 with a recommendation that they reject it. The parties continued to negotiate a variety of other issues on May 17 and July 9. On July 25, the Union and Company representatives met with the employees and Bell offered to make several changes in work rules if the Union would sign the proposal Bell had implemented.

By letter of August 10, the Eastern Conference rejected Bell's contract proposal. The parties continued to negotiate on August 20 and agreed to seek help from a mediator. On September 9, they met with a mediator and Bell raised its offer to $11.75 per hour. The employees rejected this proposal and voted to strike.

On November 8, 1982, Local 175 filed charges with the Board alleging that Bell Transit had committed an unfair labor practice by unilaterally lowering the wage rate on May 16. The NLRB General Counsel investigated the charge and filed a complaint against Bell. An ALJ held a two-day hearing and issued an opinion concluding that Bell had violated the NLRA as charged. He determined that the Union had not agreed to, nor acquiesced in, the wage increase.[1] He also found no bargaining impasse that would justify Bell's unilateral action. Specifically, the ALJ concluded that "[n]othing about the prior negotiations suggested they were exhaustive" and that Rein had believed there was "a good chance" the Eastern Conference would accept the Company's offer.[2] Thus, he stated that although subsequent events revealed that the Union's position on wages was firmer than Rein had thought, there had been no impasse on May 16 when the Company unilaterally reduced wages.

The Board, over a dissent,[3] disagreed with the ALJ and dismissed the Union's complaint. In its view, the parties had bargained in good faith to an impasse and,

---

1. The Board did not doubt this conclusion and it is not an issue before us on appeal.

2. *Bell Transit Co.*, 271 N.L.R.B. 1272, 1276 (1984).

3. The dissenting Board member stressed that the existence of an impasse must be determined

from the stance of the negotiations at the time unilateral action was taken, not from subsequent events. He concluded that the majority's analysis was at odds with this principle and would have found that there had been no impasse on May 16. 271 N.L.R.B. at 1274.

therefore, Bell Transit's unilateral wage reduction was permissible. The Board did not disagree with the ALJ's finding that Rein believed he had reached an agreement subject to Eastern Conference approval. Instead, it concluded that the impasse in negotiations had existed *concurrently* with a tentative agreement between Bell Transit and the Union.

## II.  DISCUSSION

Under section 8(a)(5) of the NLRA, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees ...." 29 U.S.C. § 158(a)(5) (1982). It is well settled that an employer is required to maintain the status quo established by an expired collective bargaining agreement until the parties reach a new agreement or bargain to an impasse. An employer violates the duty to bargain if, prior to either a final agreement or an impasse, it institutes a unilateral change in wages, hours or working conditions over which bargaining is required.[4]

■ Impasse is defined as the deadlock reached by bargaining parties "after good-faith negotiations have exhausted the prospects of concluding an agreement."[5] This court has described the situation as one in which "there was no realistic prospect that continuation of discussion at that time would have been fruitful."[6] The Board's determination of impasse involves judgments on factual issues[7] that are peculiar-

ly within the Board's expertise and a reviewing court may not disturb the Board's evaluation unless the finding is irrational or unsupported by substantial evidence.[8] In this case the Board's decision is entitled to no deference because it is based on an irrational premise without even the slightest support in the evidence.

■ There is no evidence to suggest that either the Union or Rein, Bell's president and negotiator, viewed the negotiations as deadlocked. The ALJ found, and the Board accepted, that Rein thought he had a tentative understanding with the Union, subject only to ratification by the Eastern Conference. This finding is supported by Rein's own testimony. On the Union's side, there were no findings that Local 175 regarded further negotiations as hopeless. Indeed, the Union's actions support the opposite conclusion. Just prior to Bell's reduction in wages on May 16, the Union negotiators had taken Bell's offer to the employees, who had split evenly on the proposal. The negotiators had reported the split vote to Rein and explained that this meant the drivers had *not* rejected the proposal; they had indicated they would submit it to the Eastern Conference for approval; and they had not voiced any opposition to ratification of the proposed agreement. This undisputed evidence supports a conclusion that in the contemporaneous view of *both* bargaining parties, negotiations were not at a standstill.[9]

---

4. *See NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. Cauthorne,* 691 F.2d 1023, 1025 (D.C.Cir.1982).

5. *Taft Broadcasting Co.,* 163 N.L.R.B. 475, 478 (1967), *petition for review denied sub nom. American Federation of Television & Radio Artists v. NLRB,* 395 F.2d 622 (D.C.Cir.1968).

6. *American Federation of Television & Radio Artists v. NLRB,* 395 F.2d at 628.

7. The Board typically looks to a variety of factors to determine if the parties have reached an impasse in negotiations:

      Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is

disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed.

*Taft Broadcasting Co.,* 163 N.L.R.B. at 478.

8. *See District 65, Distributive Workers of America v. NLRB,* 593 F.2d 1155, 1164 (D.C.Cir.1978); *Dallas General Drivers, Local No. 745 v. NLRB,* 355 F.2d 842, 844–45 (D.C.Cir.1966).

9. The Board has on occasion concluded that negotiations have *not* reached an impasse in spite of the bargaining parties' contemporaneous assertions that they were deadlocked. *See, e.g., Louisville Plate Glass Co.,* 243 N.L.R.B. 1175, 1181 (1979), *enf'd,* 657 F.2d 106 (6th Cir. 1981). However, none of the parties have cited any cases that stand for the converse proposi-

Moreover, the objective evidence is clear that when Bell lowered wages, neither side had taken any action to indicate that further bargaining would be fruitless. In support of its finding of impasse, the Board stressed that the parties were still far apart on wages, which it regarded as the key bargaining issue. Wages were undoubtedly an important issue, and it is true that deadlock on an issue central to negotiations may make it impossible to negotiate productively on other issues.[10] Yet, the distance between the bargaining positions on wages taken by Bell and Local 175 did not, by itself, indicate a deadlock. The employer never gave any signal that it had reached the point where, without concessions on pay from the Union, it would have to act unilaterally. The bargaining progressed at a leisurely pace with no expression of any urgency on the wage issue, and the employer had even agreed at the outset to keep the old rates in effect until a new agreement was concluded. In fact, Bell did not even present a wage proposal at the early negotiating sessions. Wage offers were discussed at only three meetings with the Union and on each occasion Bell *raised* its offer. Such continuous negotiating progress is strong evidence against an impasse.[11] The Company called its May 7 offer a "final" proposal, but this is a common bargaining tactic and Bell had applied the same label to its earlier offer on May 4. Under similar circumstances, the Board has

refused to regard this designation as dispositive.[12]

Because the Board did not dispute the finding that Rein understood the parties to have reached a tentative agreement, the only way in which it could find impasse was to conclude that an impasse can exist *simultaneously* with a tentative agreement.[13] This conclusion of law is counterintuitive, incomprehensible and, as both counsel conceded, completely without support in precedent.

The Board attempted to justify its conclusion by means of a hypothetical. It stated that an impasse exists simultaneously with a tentative agreement "when a union's negotiators accept the employer's final offer subject to ratification by the union's members. If the tentative agreement is accepted, then the impasse breaks. If the tentative agreement is rejected, then the impasse endures." [14] This generalized hypothetical is not only a non sequitur, but it draws a conclusion simply not applicable in this case. It is perhaps arguable that an impasse and tentative agreement could coexist under certain circumstances. For example, an employer might make it plain that if the union wants an agreement it has no choice but to accept a particular offer, while the union negotiators simultaneously articulate their disapproval of the proposal but nonetheless submit it for approval.

tion—that negotiations *were* at an impasse in spite of both parties' belief that they *were not.*

**10.** *See Financial Institution Employees of America, Local No. 1182 v. NLRB,* 738 F.2d 1038, 1042 (9th Cir.1984); *American Federation of Television & Radio Artists v. NLRB,* 395 F.2d at 627 n. 13.

**11.** *See, e.g., Harding Glass Indus.,* 248 N.L.R.B. 902, 906 (1980) ("[T]he fact that each session produced forward movement tends to negate a conclusion of deadlock."), *enf'd,* 672 F.2d 1330 (10th Cir.1982).

In its brief, the NLRB makes much of the fact that the Union did not change its demand for $13.15 per hour during the negotiations. This does not, however, dictate that bargaining was deadlocked. *See Local 13, Detroit Newspaper Printing and Graphics Communications Union v. NLRB,* 598 F.2d 267, 273 (D.C.Cir.1979) ("Parties

commonly change their position during the course of bargaining notwithstanding the adamance with which they refuse to accede at the outset."); *Harding Glass Indus.,* 248 N.L.R.B. at 906 ("That the parties may have expressed intrasigent [sic] attitudes is not controlling. In negotiations those may be no more than tactical declarations.").

**12.** *See Louisville Plate Glass Co.,* 243 N.L.R.B. at 1181 & n. 23.

**13.** At oral argument, counsel for intervenor Bell Transit argued that this statement by the Board was merely dicta. We disagree. Given the Board's acceptance of the finding of tentative agreement, the conclusion that impasse could coexist with a tentative agreement was *crucial* to the NLRB's holding and could not be dicta.

**14.** *Bell Transit Co.,* 271 N.L.R.B. at 1273 n. 9.

But that is not this case. Bell did not create a situation in which the Union had no choice other than to accept its May 7 offer. In addition, at the time of Bell's wage reduction, all indications were that, rather than disapproving the proposal, the Local 175 membership had failed to reject it.

Apart from finding no support in the law, the Board's view that tentative-agreement-subject-to-ratification-equals-impasse would produce absurd situations in labor negotiations, wholly at odds with the notion of *good faith* bargaining under the NLRA. It is very commonplace in the United States for bargaining parties to reach tentative agreements subject to ratification. Often, this tradition facilitates bargaining because it ensures some meaningful employee participation in the bargaining process; it allows parties to settle and "save face" even in situations where they have previously maintained rigid bargaining positions; and it also gives both sides an opportunity to double-check against any flaws in their "final offers." However, if such a tentative agreement is seen as reflecting an impasse, thus allowing the employer preemptively to institute unilateral changes, the process leading to such an arrangement and the arrangement itself become pointless. Obviously this makes no sense when it is recognized that the device of a "tentative agreement" is usually intended to be *mutually beneficial* to the parties in helping to resolve difficult bargaining disputes.

It is also clear that failure to ratify a contract proposal cannot automatically result in impasse when the parties' bargaining history does not even hint that a failure to ratify will cause a breakdown in negotiations. Indeed, this very case is testimony to the artificiality of finding impasse during submission of a tentative agreement for approval. The Eastern Conference's rejection of the proposal did *not* result in a breakdown of negotiations; the parties continued to bargain on the issue of wages and eventually entered into mediation in a further effort to iron out their differences.

Finally, the intervenor, Bell Transit, argues that the Board's interpretation is necessary for policy reasons when an employer proposes a wage reduction. Otherwise, it argues, a union would be inclined to delay ratification procedures to forestall a new agreement or an impasse that would result in lower pay. Again, that is not this case. There are no allegations that the Union delayed unduly in submitting the proposal to the Eastern Conference or otherwise failed to engage in good-faith bargaining. The Company made its unilateral change in wages only one week after it received notification that the employees had not rejected it. Bell was clearly *not* responding to foot-dragging on the part of the Union. Moreover, the parties had already agreed that the new wage would be retroactive, making delay on the Union's part completely pointless.

### III. CONCLUSION

In sum, we perceive no basis for the Board's decision. It rests on an irrational hypothetical regarding impasse, which has no relation to the facts of this case and therefore lacks support in substantial evidence. Furthermore, neither the Board nor the parties have been able to cite any legal authority to support the Board's strained new view on the meaning of a bargaining impasse. For the reasons heretofore indicated, we reverse and remand to the NLRB for a determination of back pay and any other appropriate remedies for the employer's unlawful refusal to bargain.

*So ordered.*