836 F.2d 289
 127 L.R.R.M. (BNA) 2148, 108 Lab.Cas. P 10,288
 RICHMOND RECORDING CORP. d/b/a P.R.C. Recording Co.,
Petitioner-Cross- Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
and
International Bhd. of Elec. Workers, Local Union No. 2043,
AFL-CIO, Intervening Respondent-Petitioner.
 Nos. 86-2056, 86-3050 and 86-3158.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 24, 1987.
Decided Dec. 16, 1987.
Rehearing and Rehearing En Banc Denied Feb. 1, 1988.
 
 Frank H. Stewart, Taft, Stettinius & Hollister, Cincinnati, Ohio, Jerry A. Spicer, Snyder, Rakay & Spicer, Dayton, Ohio, for petitioner-cross-respondent.
 Mark McCarty, N.L.R.B., Washington, D.C., for respondent-cross-petitioner.
 Before BAUER, Chief Judge, KANNE, Circuit Judge, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 In this case, Richmond Recording Company, doing business here as PRC Recording Company ("PRC"), petitions for review of an order by the National Labor Relations Board ("NLRB"). In its order, the NLRB found that PRC violated Sec. 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) and (5), by unilaterally implementing its contract proposals before negotiations with its employee union had reached an impasse. The NLRB also found a violation of Sec. 8(a)(1) because PRC threatened to retreat to a regressive bargaining posture if the union refused the company's "final offer." In addition, the NLRB found that PRC violated Sec. 8(a)(1) and (3) when it refused to reinstate the unfair labor practice strikers after they had made an unconditional offer to return to work. In response to PRC's petition for review, the NLRB cross-petitions for enforcement of its order. PRC's employee union, the International Brotherhood of Electrical Workers, Local Union No. 2043, is an intervening respondent-petitioner. It petitions for review of the portion of the NLRB's order upholding the discharge of twenty-four striking employees. We deny PRC's petition for review and the union's intervening petition for review, and grant the NLRB's cross-application for enforcement of its order.
 
 
 2
 * PRC Recording Company manufactures, sells and distributes phonograph records and tapes. Its employee union is divided into two divisions: a record division and a tape division. PRC's collective bargaining agreement with the record division was due to expire April 30, 1982, and on May 1, 1982 with the tape division. The parties began renegotiating the terms of its contracts with the separate divisions prior to the expiration date of the first contract, but had not reached a new agreement by April 30, 1982. On April 30, the company's chief negotiator presented his last proposal, which he labeled his "final offer," and stated that the parties would be "back to square one" if this offer was rejected and followed by a strike. On May 1, the Union rejected this "final offer," but acquiesced to the company's request that the parties meet again on May 5.
 
 
 3
 The negotiations of May 5 did not prove to be more productive. In the morning session, the parties reached a stalemate. During the lunch break, PRC's Industrial Relations Director, Robert Jewell, went to the plant to implement unilaterally the company's proposal on job classifications. Up to that time, the employees had been divided into several job classifications, which were further subdivided into several labor grades. During contract negotiations, PRC proposed combining these job classifications so that PRC could reassign employees to new combinations more easily. However, at the time that Jewell implemented the new system, the parties had not yet reached an agreement on this proposal. While the parties were at lunch, Jewell physically destroyed the former job classification system, a manual system consisting of magnetic tapes combined with a computer tape system, as well as the record of the employees' seniority under that system. PRC did not reveal to the union Jewell's activities that day.
 
 
 4
 After lunch, when the bargaining began anew, PRC's chief negotiator declared that the parties were at an impasse. The union's chief negotiator refuted this, declaring the union's flexibility. Later that day, the union presented a new proposal which the company rejected. At 8:00 p.m., the company telephoned various employees and directed them to work in the new job classifications beginning the next day.
 
 
 5
 On May 6 and 7, some of the employees worked jobs that differed from their usual assignments. On May 8, the union voted against the tentative agreements because of PRC's unilateral implementation of its new job classifications. PRC again declared that an impasse had occurred and on May 11 unilaterally implemented the remainder of its proposals, including its wage reduction plan. On May 13, the union went on strike because of the May 6 and May 11 implementation of the company's proposals.
 
 
 6
 Beginning in May 20, PRC hired permanent replacements for the striking employees and completed its hiring by June 25. On June 28, the union telegrammed the company, tendering the employees' unconditional offer to return to work. The next day, PRC responded by promising to reinstate strikers as the positions became available. On July 13, the union again telegrammed its unconditional offer to return to work, and the company began offering piecemeal reinstatement to striking employees. By January 1983, all of the striking employees, except those discharged for strike misconduct, were offered reinstatement.
 
 
 7
 The NLRB obtained jurisdiction under 29 U.S.C. Sec. 160(c). In its order, the NLRB found that the company violated Sec. 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) and (5), by unilaterally implementing its job classification proposal before the proposal was approved by the union, or an impasse had been reached. The NLRB held that the resulting strike by PRC employees thus constituted an unfair labor practice strike. The NLRB also found that PRC violated Sec. 8(a)(3) and (1) of the Act by refusing to reinstate these unfair labor practice strikers after they had made an unconditional offer to return to work. PRC was also found guilty of violating Sec. 8(a)(1) because it threatened to withdraw its contract proposal and substitute a less desirable offer if the union rejected the proposal.
 
 
 8
 However, the NLRB dismissed the union's allegation that the company unlawfully discharged 21 striking employees. It also found, in disagreement with the administrative law judge, that three additional workers had been lawfully discharged.
 
 II
 
 9
 In order to be upheld, the NLRB's findings must be supported by substantial evidence on the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) (elucidating Congressional directive that court must review NLRB's decision by looking at the entirety of the record to ensure that the decision was based on substantial evidence); Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1331 (7th Cir.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed. 256 (1978). Our analysis of the record indicates that an impasse did not occur prior to the time the company implemented its job classification system.
 
 
 10
 By unilaterally changing the job classification system before an impasse had been reached, the company violated Sec. 8(a)(1) and (5) of the Act. Sections 8(a)(1) and (5) provide, respectively, that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," 29 U.S.C. Sec. 158(a)(1), and for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a)," 29 U.S.C. Sec. 158(a)(5).
 
 
 11
 An employer violates these two sections if he unilaterally changes a condition of employment that is under negotiation before bargaining has reached an impasse. See, e.g., NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (stating that such action "is a circumvention of the duty to negotiate which frustrates the objectives of Sec. 8(a)(5) much as does a flat refusal"); Electri-Flex Co. v. NLRB, 570 F.2d at 1337-38; Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60, 64 (2d Cir.1979); Saunders House v. NLRB, 719 F.2d 683, 686 (3d Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 554 (1984). However, after an impasse has been reached, the employer can implement changes unilaterally as long as the changes were previously offered to the union. See Huck Mfg. Co. v. NLRB, 693 F.2d 1176, 1186 (5th Cir.1982) (pointing out that "when impasse occurs, the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the Union during bargaining").
 
 
 12
 The determination of when an impasse exists is a question of fact, see Saunders House v. NLRB, 719 F.2d at 687-88. Because of the subjectivity involved in deciding when an impasse has occurred, its existence is an inquiry "particularly amenable to the expertise of the Board as fact finder." Huck Mfg. Co., 693 F.2d at 1186. See also Carpenter Sprinkler Co. v. NLRB, 605 F.2d at 65; Dallas Gen. Drivers v. NLRB, 355 F.2d 842, 844-45 (D.C.Cir.1966).
 
 
 13
 In essence, an impasse occurs when the parties are deadlocked. See, e.g., Huck Mfg. Co., 693 F.2d at 1186; American Fed'n of Television and Radio Artists, 395 F.2d 622, 627 (D.C.Cir.1968). The NLRB may determine that an impasse exists "[w]here good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock." Dallas Gen. Drivers v. NLRB, 355 F.2d at 845.
 
 
 14
 PRC unilaterally implemented its new job classification scheme before the parties had reached an impasse. The company's Industrial Relations Director irrevocably destroyed the old system during the lunch hiatus on May 5, even before PRC's chief negotiator declared that the parties were at an impasse. We note here that a party's declaration that an impasse has occurred will not be dispositive in determining whether one does indeed exist--all of the circumstances of the case must be analyzed. An impasse has not occurred if both parties are still negotiating. See, e.g., Huck Mfg., 693 F.2d at 1186-87; Teamsters Local Union No. 175 v. NLRB, 788 F.2d 27, 32 (D.C.Cir.1986). By 2:30 p.m. on the same day, the union presented its second counterproposal, thus evincing its flexibility. Since an impasse also did not exist on May 11 when the union rejected the company's proposals, the company could not activate the rest of its proposals. The administrative law judge determined that the union showed its continued readiness to bargain, and we concur. This finding refutes any allegation of an impasse.
 
 III
 
 15
 Because the company illegally imposed its unilateral changes on the union, the ensuing strike by the employees became an unfair labor practice strike. This court has upheld a strike as an unfair labor practice strike even though the strike was only partially based on an unfair labor practice charge. See NLRB v. My Store, 345 F.2d 494, 498 (7th Cir.), cert. denied, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965); NLRB v. Lyon & Ryan Ford, Inc., 647 F.2d 745, 754 (7th Cir.), cert. denied, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981). See also Carpenter Sprinkler Corp. v. NLRB, 605 F.2d at 68 (stating that a strike by employees as a result of the company's unilateral changes in terms of employment, without an impasse in negotiations, constituted an unfair labor practice strike).
 
 
 16
 By refusing to reinstate these strikers after their unconditional offer to return to work, the company violated Sec. 8(a)(3) and (1) of the Act. Unfair labor practice strikers "do not lose their status [as employees] and are entitled to reinstatement with back pay, even if replacements for them have been made." Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956). See also NLRB v. Lyon & Ryan Ford, Inc., 647 F.2d at 754. According to the Act, an employer violates Sec. 8(a)(3) if he discriminates "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. Sec. 158(a)(3).
 
 
 17
 The company contends that it did not violate the Act because the union made a conditional offer to return to work. The union had rejected the company's piecemeal reinstatement procedure, and demanded that all striking employees be reinstated at once. The administrative law judge found this to be a reasonable demand of the union's legal rights, and we concur. Our decision in American Cyanamid Co. v. NLRB, 592 F.2d 356 (7th Cir.1979), establishes that in the case of unfair labor practice strikers, all are entitled to reinstatement unless such entitlement is lost for some other reason. The union was merely demanding its rights when it rejected the company's piecemeal reinstatement plan, and its subsequent demand for total reinstatement does not make its offer to return a conditional one. Id. at 362-63.
 
 
 18
 Moreover, we do not believe that the company's offers of reinstatement were to substantially similar positions. Thus, PRC's backpay obligation was not tolled. Unfair labor practice strikers are "not obligated to accept work under terms and conditions inferior to those which they [are] entitled to in order to protect their rights under the Act." Harding Glass Indus., Inc. v. NLRB, 672 F.2d 1330, 1339 (10th Cir.1982) (awarding such strikers reinstatement and back pay). An employer is obligated to offer reinstatement to unfair labor practice strikers on terms and conditions of employment that would have existed but for the employer's unlawful conduct. American Cyanamid Co., 592 F.2d at 361-63. When Jewell unilaterally put the new job classification system into place, he not only changed the jobs that some of the employees performed, but recalculated seniority based on these new classifications, reduced wage rates, and combined jobs. Some of the employees testified that on May 6 and 7, the first time that the new classifications were used, they were forced to do new jobs that were substantially more dangerous than those they had performed before, and for which they were not trained.
 
 
 19
 Based on the record before us, we conclude that substantial evidence in the record as a whole supports the NLRB's conclusion that the company committed an unfair labor practice by refusing to reinstate the unfair labor practice strikers after their unconditional offer to return to work. The company's piecemeal reinstatement, beginning July 23 and continuing up to January 31, 1986, does not satisfy its obligation of reinstatement.
 
 IV
 
 20
 The NLRB also decided that PRC violated Sec. 8(a)(1) by threatening to withdraw its contract proposal if the union went on strike. Our review of the record indicates that substantial evidence supports the Board's finding. The company's chief negotiator had promised the union that if the employees rejected PRC's "final offer," the parties would "be back to square one." The company's threat was directed to the union's exercise of their protected right to strike, and this constituted an unfair labor practice. See TRW-United Greenfield Div. v. NLRB, 637 F.2d 410, 420-21 (5th Cir.1981). Although a statement that bargaining will regress is not per se unlawful, when such a statement "effectively threaten[s] employees with a loss of existing benefits and leave[s] them with the impression that what they may ultimately receive depends in large measure upon what the union can induce, the Employer to restore," TRW-United Greenfield Div. v. NLRB, 637 F.2d at 420, a violation of Sec. 8(a)(1) occurs.
 
 V
 
 21
 Finally, we reach the issue of whether the company violated Sec. 8(a)(1) of the Act by dismissing or refusing to reinstate twenty-four of the striking employees. The administrative law judge had found that twenty-one of the discharged strikers acted in a way that would coerce or intimidate employees in the exercise of their statutory rights. The NLRB agreed with the administrative law judge's findings, and further found, contrary to the administrative law judge, that three additional employees who had been discharged had acted in a similar manner. We will not detail the twenty-four separate incidents, but after having examined the record, we will uphold all of the Board's findings in this regard.
 
 
 22
 An objective standard has been used by both the Board and the courts in determining whether an employer has violated the Act by discharging a striking employee. Such an employee's conduct must have had a tendency to coerce other employees in the exercise of their protected rights. See, e.g., NLRB v. Gold Standard Enter., Inc., 679 F.2d 673, 676 (7th Cir.1982); Local 542, Int'l Union of Operating Eng'rs v. NLRB, 328 F.2d 850, 852-53 (3d Cir.1964), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964) (emphasizing that whether anyone was in fact coerced is irrelevant). An employer is not justified in dismissing a striker who was engaging in protected strike activity unless it can be proved that the striker engaged in serious strike misconduct. Newport News Shipbuilding & Dry Dock Co., 738 F.2d 1404, 1408 (4th Cir.1984). Strike misconduct becomes serious if it reasonably tends to coerce or intimidate. Id. at 1408. This court must give considerable deference to an NLRB decision that applies this standard. See Associated Grocers of New England, Inc. v. NLRB, 562 F.2d 1333, 1336 (1st Cir.1977).
 
 
 23
 We agree with the Board that these twenty-four strikers engaged in serious strike misconduct, the natural consequences of which tended to coerce other employees. The administrative law judge correctly found that the misconduct of these strikers was not privileged by the company's unfair labor practices. See NLRB v. Thayer, 213 F.2d 748, 756-57 (1st Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954).
 
 
 24
 The union may be able to refute the Board's credibility resolutions if it can show that the employees did not in fact engage in such misconduct, see NLRB v. Burnup & Sims, 379 U.S. 21, 22-23, 85 S.Ct. 171, 172-73, 13 L.Ed.2d 1 (1964), or that the misconduct was not serious enough to warrant discharge, see Newport News Shipbuilding & Dry Dock Co., 738 F.2d at 1408. However, we find that the union has not shown a basis for overturning the Board's credibility resolutions in this case. We have established that a reviewing court would only have license to overturn the credibility determinations of the administrative law judge and the NLRB under exceptional circumstances. See NLRB v. Rain-Ware Inc., 732 F.2d 1349, 1354 n. 6 (7th Cir.1984); Electri-Flex Co. v. NLRB, 570 F.2d at 1331-32. The union alleges that the administrative law judge perfunctorily claimed that his findings were based on demeanor. However, the record indicates that the administrative law judge discredited various portions of testimony from the company's witnesses, as well as from the union's. Just because he credited PRC's witnesses more than the union's does not alone provide a grounds for reversal. See generally NLRB v. Del Rey Tortilleria, Inc., 787 F.2d 1118, 1121 (7th Cir.1986). An administrative judge's credibility resolutions are entitled to deference when he must choose between two versions of the same incident as occurred here. See NLRB v. Jarm Enter., Inc., 785 F.2d 195, 203 (7th Cir.1986).
 
 
 25
 For all of the foregoing reasons, we enforce the cross-application of the National Labor Relations Board for enforcement, and deny the petitions for review by PRC Recording Company and its employee union.